**J. Larry BYROM, Plaintiff,**

v.

**DELTA FAMILY CARE–DISABILITY AND SURVIVORSHIP PLAN; Delta Airlines, Inc.; Administrative Committee of Delta Airlines, Inc.; Aetna U.S. Healthcare; Aetna Life Insurance Company; and John Does I–V, Defendants.**

No. CIV.A.1:03–CV–1685–J.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 29, 2004.

---

Pamela Ilene Atkins, Galler & Atkins, Atlanta, GA, for Plaintiff.

John Timothy McDonald, Rogers & Hardin, Atlanta, GA, for Defendants.

## ORDER

CARNES, District Judge.

This case is presently before the Court on Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Airlines, Inc.'s Motion for Summary Judgment [16]; Plaintiff's Motion for Summary Judgment [17]; Defendants Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Air Line, Inc.'s Motion for Leave to File Reply to Plaintiff's Response to Statement of Undisputed Material Facts [25]; Plaintiff's Motion for Leave to File Reply Brief in Excess of Page Limitation [27]; Defendants Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Air Lines, Inc.'s Motion for Leave to File Reply to Plaintiff's Response to Statement of Undisputed Material Facts [30]; Plaintiff's Motion for Leave to File Plaintiff's Sur–Reply and Incorporated Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Opposition to Defendants' Reply to Plaintiff's Response to Defendants' Statement of Undisputed Facts [31]; Defendants' Motion to Withdraw its April 5, 2004 Motion for Leave to File Reply to Plaintiff's Response to Statement of Undisputed Material Facts [32]; and Defendants' Conditional Motion for Leave to Reply [33]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Airlines, Inc.'s Motion for Summary Judgment [16] should be **DENIED**; Plaintiff's Motion for Summary Judgment [17] should be **GRANTED**; Defendants Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Air Line, Inc.'s Motion for Leave to File Reply to Plaintiff's Response to Statement of Undisputed Material Facts [25] should be **DENIED**; Plaintiff's Motion for Leave to File Reply Brief in Excess of Page Limitation [27] should be **GRANTED**; Defendants Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Air Lines, Inc.'s Motion for Leave to File Reply to Plaintiff's Response to Statement of Undisputed Material Facts [30] should be **DENIED as moot**; Plaintiff's Motion for Leave to File Plaintiff's Sur–Reply and Incorporated Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Opposition to Defendants' Reply to Plaintiff's Response to Defendants' Statement of Undisputed Facts [31] should be **DENIED**; Defendants' Motion to Withdraw its April 5, 2004 Motion for Leave to File Reply to Plaintiff's Response to Statement of Undisputed Material Facts [32] should be **GRANTED**; and Defendants' Conditional Motion for Leave to Reply [33] should be **DENIED**.

## BACKGROUND

On June 17, 2003, plaintiff J. Larry Byrom filed his Complaint in this Court against Delta Family Care–Disability and Survivorship Plan (the "Plan"), Delta Air Lines, Inc., the Administrative Committee of Delta Air Lines, Inc. (the "Administrative Committee"), Aetna U.S. Healthcare, Aetna Life Insurance Company, and John Does I–V. On August 7, 2003, plaintiff dismissed without prejudice all defendants except the Plan and the Administrative Committee. (Stipulation of Dismissal

Without Prejudice [9].) Plaintiff also dismissed all counts of his Complaint except for a claim for long-term disability benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), and for an award of attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1). (Stipulation of Dismissal Without Prejudice [9].)

Plaintiff and defendants have filed cross-motions for summary judgment. In part, the Court draws the undisputed facts of this case from "Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Air Lines, Inc.'s Statement of Undisputed Material Facts" ("DSMF") [16] and "Plaintiff's Statement of Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment" ("PSMF") [17]. Other portions of the statement of facts are a result of the Court's own review of the administrative record. In fact, it is from the administrative record itself that the Court draws the bulk of the statement of facts in this case. If, however, one of the parties has disputed a specific fact and pointed to evidence in the record supporting his version of events, the Court has viewed all evidence and factual inferences in the light most favorable to that party, as required on an opposing party's motion for summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[O]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.").

## I. *Administration of the Plan*

The Plan is a non-contributory employee welfare benefit plan established and maintained pursuant to ERISA to provide both short-term and long-term disability ("LTD") benefits to non-pilot Delta employees. (DSMF at ¶ 1.) The Administrative Committee is the Plan Administrator and Named Fiduciary as those terms are defined by ERISA for purposes of the Plan's operation and administration. (*Id.*) The Plan is a legally distinct entity with the power to sue and be sued. *See* 29 U.S.C. § 1132(d)(1).

The Administrative Committee enjoys the exclusive power to interpret the Plan and to carry out its provisions. (DSMF at ¶ 4.) Section 12.01 of the Plan vests in the Administrative Committee the full power to operate and administer the Plan.[1] (*Id.*) Section 12.02 of the Plan references specific examples of the Administrative Committee's powers and duties. (*Id.* at ¶ 5.) These powers include interpreting and construing the Plan and deciding all questions of eligibility of any claimant under the Plan.[2] (*Id.*) The Administrative Com-

---

1. Section 12.01 of the Plan states in part that:

 The operation and administration of the Plan ... the exclusive power to interpret it, and the responsibility for carrying out its provisions are vested in the Administrative Committee of at least three members, which Committee shall be the Administrator of the Plan.... The Administrative Committee shall establish rules for administration of the Plan and the transaction of its business. The Administrative Committee shall be the named fiduciary of the Plan for purposes of operation and administration of the Plan....

(DSMF at ¶ 4.)

2. Section 12.02 of the Plan states in part that:
 In addition to the powers and duties otherwise stated in this Plan, the Administrative Committee shall have such duties and powers as may be necessary to discharge its responsibilities under the Plan, including, but not limited to, the following:
 (a) To establish and enforce such rules, regulations, and procedures as it shall deem necessary or proper for the efficient operation and administration of the Plan;
 (b) The discretionary authority to interpret and construe the Plan, and decide all ques-

mittee is also empowered to decide all other questions under the Plan, and its decisions are deemed to be final and conclusive. (*Id.*)

The Plan also sets forth the eligibility criteria for both short-term and long-term disability benefits. Section 4.02 of the Plan states, in relevant part, that:

> An eligible Employee shall qualify for Short Term Disability benefits when disabled as a result of a demonstrable injury or disease (including mental or nervous disorders) or pregnancy which prevents the Employee from engaging in the Employee's customary occupation. The duration of the Short Term Disability period is 26 weeks following the date the disability commenced . . .

(Decl. of James Merna, Esq. at Ex. A, attach. to Delta Family–Care and Survivorship Plan and Administrative Committee of Delta Air Lines, Inc.'s Mot. for Summ. J. (hereinafter, "Defs.' Mot. for Summ. J.") [16] at Ex. 1.) Section 4.03 of the Plan states, in relevant part, that:

> If upon expiration of the Employee's Short Term Disability period, he continues to qualify for Short Term Disability, the Employee may apply for Long Term Disability. The Employee shall be eligible for Long Term Disability provided he is disabled at that time as a result of

demonstrable injury or disease (including mental or nervous disorders) which will continuously and totally prevent him from engaging in any occupation whatsoever for compensation or profit, including part-time work.

(*Id.*)

The Administrative Committee delegated the initial determination of disability under the Plan, and the ongoing review of the continuous nature of the disability, to Aetna Life Insurance Company. (DSMF at ¶ 6.) Under the terms of the plan, if long-term disability benefits are denied or discontinued, the employee can seek review of that decision under the plan's two-level review procedure. (*Id.*) The first level of review is handled by Aetna, and the second level of review is provided by the Administrative Committee itself. (*Id.*) At either level, a claimant may review Plan documents and the claimant's file, as well as submit any written evidence of arguments the claimant deems appropriate to support his claims for coverage. (*Id.*)

Delta does not directly contribute any monies to the Plan. (*Id.* at ¶ 7.) Instead, Delta pays into a trust fund called the Benefits Trust. (*Id.*) The Benefits Trust then provides monies for the Plan's provision of benefits. (*Id.*) Delta makes periodic contributions to the Benefits Trust

---

tions of eligibility of any Eligible Family Member to participate in the Plan or to receive benefits under it, its interpretation and decisions to be final and conclusive; (c) To determine the amount, manner, and time of payment of benefits which shall be payable to any Employee or Dependent, in accordance with the provisions of the Plan, and to determine the person or persons to whom such benefits shall be paid;

\* \* \* \* \* \*

(g) To decide all questions concerning the Plan;

\* \* \* \* \* \*

(I) To delegate all its powers and duties as set forth in Section 12.04.

**The Administrative Committee shall have the broadest discretionary authority permitted under law in the exercise of all of its functions including, but not limited to, deciding questions of eligibillte, interpretation, and the right to benefits hereunder but shall act in an impartial and non-discriminatory manner with respect thereto.** (DSMF at ¶ 5 (emphasis in original).)

which can never revert back to Delta. (*Id.*) Thus, the contributions are considered irrevocable. During the plan year ending June 30, 2000, the year in which plaintiff's benefits were discontinued, the Benefits Trust contained assets far in excess of the amounts paid out. (*Id.*) Specifically, the Trust had assets of $377,576,000 and paid $40,575,000 to participants and beneficiaries. (*Id.*)

## II. *Plaintiff's Employment and Disability History*

Plaintiff began his employment with Delta Air Lines on January 2, 1979. (PSMF at ¶ 2.) Plaintiff was employed as a cargo coordinator, a position which required him to do both office work and heavy lifting involved with loading cargo. (Compl. [1] at ¶ 12.) Plaintiff's last day of work before he went out on leave was November 4, 1999. (DSMF at ¶ 9.) In March 2000, plaintiff contacted Aetna and stated that he had been out of work since November 7, 1999, due to rheumatoid arthritis all over his body and in his left lung. (PSMF at ¶ 7.) Plaintiff stated that due to his condition he was unable to load cargo and that he could not sit or type for very long. (Administrative Record at 242, attach. to Decl. of James Merna, Esq. at Ex. B, attach. to Defs.' Mot. for Summ. J. [16] at Ex. 1 (hereinafter, "A.R.").)[3] Plaintiff further stated that he had suffered a ruptured colon in 1996 and that he had a history of heart attack and stomach problems. (*Id.*) According to plaintiff's medical history, by the time plaintiff went out on leave he had been suffering with rheumatoid arthritis since 1990. (*Id.* at 28.)

Aetna contacted Dr. Rattandeep Singh, plaintiff's rheumatologist, who confirmed the diagnosis of rheumatoid arthritis and synovitis of the hands. (PSMF at ¶ 8.)

Aetna asked Dr. Singh if he felt that plaintiff was capable of part-time sedentary work, and Dr. Singh replied that plaintiff was on very aggressive chemotherapy and that he was totally disabled and could not do anything. (A.R. at 242–43.) Aetna therefore certified plaintiff for twenty-six weeks of short-term disability benefits, to end May 26, 2000, and scheduled him for an Independent Medical Examination ("IME") with Dr. Alan Gottlieb, a rheumatologist selected by Aetna. (*Id.* at 243.)

Dr. Gottlieb examined plaintiff on April 24, 2000, and diagnosed him with erosive rheumatoid arthritis. (*Id.* at 29.) Dr. Gottlieb noted that despite treatment with various medications, plaintiff was still "quite symptomatic," with pain in his neck, left shoulder, elbows, wrists, hands, lower back, knees, ankles, and feet. (*Id.* at 28–29.) Indeed, Dr. Gottlieb characterized plaintiff's disease as "very difficult to control." Dr. Gottlieb also noted as a "complicating factor" that plaintiff had "significant pulmonary disease, requiring what sounds like an open lung biopsy in the very near future." (*Id.* at 29.) Ultimately, Dr. Gottlieb concluded that plaintiff was "completely disabled and unable to do any kind of work, including sedentary activities." (*Id.*) According to Dr. Gottlieb, if plaintiff "has activities such as writing, sitting, for any significant period of time in one position, or having to use his arms, [it] would be very, very difficult." (*Id.*) Finally, in the "Disability Determination Summary Form" report that Dr. Gottlieb prepared, Dr. Gottlieb indicated that plaintiff would be unable to return to any gainful work and characterized the length of plaintiff's disability as indefinite. (*Id.* at 31.)

On May 5, 2000, Dr. Bonner, Aetna's Medical Director, reviewed plaintiff's file

---

**3.** The pages of the Administrative Record are numbered in the following fashion: "JLB000." For simplicity's sake, the Court refers only to the last digits.

and approved sixty days of LTD. In the course of his review, Dr. Bonner noted Dr. Gottlieb's report that plaintiff was unable to perform any work but indicated that he wanted plaintiff to undergo a Functional Capacity Evaluation ("FCE") with special emphasis on plaintiff's use of his hands and arms in order to better assess plaintiff's physical abilities. (*Id.* at 8.)

On May 25, 2000, the Social Security Administration (SSA) informed plaintiff that he was entitled to disability benefits based on a disability start date of October 30, 1999. (*Id.* at 425.) The SSA also informed defendants of plaintiff's disability award. (*Id.* at 423.)

On June 20–21, 2000, consistent with Aetna's orders, plaintiff underwent a two-day FCE. The report summarizing the results of this FCE was signed by Physical Therapist Shirley Head and Physical Therapist Assistant Jim Keith of HealthSouth, but the record does not indicate who actually conducted the exam. (*Id.* at 36; PSMF at ¶ 13; DSMF at ¶ 12.) According to the HealthSouth FCE report, as a result of "deficits" found in plaintiff's musculoskeletal system, plaintiff "ambulates with a lurch and uneven stop length. He walks quickly with his head forward and leans with an approximately 45 [degree] angle in the cervical spine." (A.R. at 32.) Plaintiff was observed to walk with an "abnormal arm swing," which plaintiff claimed was part of the manner in which he needed to walk "to protect his back pain." (*Id.* at 33.) During the exam palpation to the cervical area and lumbar region "elicits immediate pain responses." (*Id.* at 33.) Though the therapists' report indicates plaintiff's range of motion for all limbs was within normal limits, during plaintiff's material handling exam plaintiff "was unable to assume safe lift position" and a HealthSouth member stopped "shoulder-to-overhead" and "50–foot carry" activity due to

"unsafe body mechanics". (*Id.* at 35.) The results for plaintiff's positional tolerance exam were not much better. The report for this exam indicates that plaintiff "sat for less than 10 minutes at any one time." (*Id.*) Plaintiff did demonstrate "tolerance of walking, stair climbing, trunk bending, trunk twisting, overhead reach, and push/pull on an occasional basis and sitting, standing, and forward reaching (repetitive and sustained) on a frequent basis." (*Id.* at 32.) Still, in the end, the activities "not recommended" for plaintiff by the FCE included: bending, stooping, squatting, crouching, kneeling, crawling, and climbing ladders. (*Id.* at 37.)

Despite, or as a consequence of, these test results Ms. Head and Mr. Keith concluded that:

> The results of this evaluation indicate that Mr. Byrom could meet requirements of a job in the sedentary category as defined by the U.S. Department of Labor Work Classification Level in an eight-hour time period on a full-time basis. A job which would allow for frequent position changes between sitting and standing is recommended.
>
> Based upon subjective complaints of pain without objective signs and monitoring of the client's heart rate, it is felt that these are the minimal capabilities of the client and not the maximal capabilities.

(*Id.* at 32.)

Based on "clinical information provided," in a letter dated July 7, 2000, Aetna informed plaintiff that his claim for LTD benefits was denied. (*Id.* at 48.) The Aetna Medical Director, Dr. Bonner, noted that the FCE showed that plaintiff was capable of performing sedentary work on a part-time to full-time basis. Based on this FCE and the plan's requirement that plaintiff be unable to perform any level of work to qualify for LTD benefits, Dr. Bon-

ner terminated plaintiff's LTD benefits. (*Id.*)

Aetna received plaintiff's appeal of this denial on August 19, 2000. (*Id.* at 244.) In support of this appeal plaintiff's rheumatologist, Dr. Singh, in a letter dated August 8, 2000, stated that plaintiff had suffered from severe rheumatoid arthritis for approximately thirteen years and had developed interstitial lung disease as a result. (*Id.* at 51.) Dr. Singh stated that he had treated plaintiff aggressively with several different medications, "but was unable to get a good handle on his rheumatoid arthritis." (*Id.*) Dr. Singh also indicated that a few weeks prior to undergoing the HealthSouth FCE, plaintiff had experienced severe lower back pain and had undergone steroid epidural injections. (*Id.* at 52.) According to Dr. Singh, these injections had benefitted plaintiff a great deal, and had likely caused him to perform better on the FCE than he otherwise could have. (*Id.*) Dr. Singh stated that even though steroids are very effective in helping to relieve the pain of rheumatoid arthritis, plaintiff could not continue to receive them because they had previously caused perforations of his colon that required surgical correction. (*Id.*) Dr. Singh concluded that plaintiff had been feeling better due to the rest he was getting and that if he returned to work, even on only a part-time basis in a sedentary job, it would, "significantly flare-up his rheumatcid arthritis and if he does indeed live to be old, there will be no quality to his life." (*Id.*)

At the same time plaintiff also submitted a letter from Dr. Adrian Douglass, his general internist, who had been treating plaintiff since August 28, 1999. (*Id.* at 78.) Dr. Douglass stated that plaintiff continued to, "maintain a significant element of disability which would prevent him from working." (*Id.*) According to Dr. Douglass, plaintiff's rheumatoid arthritis was affecting his musculoskeletal system, cardiac system, and pulmonary system, and plaintiff was, "again plagued by the recurrence of his left lower extremity sciatica making prolonged sitting and standing a very difficult proposition." (*Id.*)

On November 17, 2000, the Aetna Medical Director, Dr. Bonner, reviewed plaintiff's file and noted that even though the HealthSouth FCE had shown plaintiff to be capable of sedentary work, plaintiff and Dr. Singh were reporting that plaintiff had received an epidural steroid injection shortly before the FCE and that this was the likely reason for his reasonable performance on the FCE. (*Id.* at 15.) Dr. Bonner thus decided to approve LTD benefits for plaintiff from July 5, 2000, through December 31, 2000, and to order three days of surveillance of plaintiff. (*Id.*)

Aetna did, in fact, retain a private investigation firm to conduct surveillance of plaintiff. On December 8, 11, and 12, 2000, an investigator traveled to plaintiff's residence in Jonesboro, Georgia to determine the extent of plaintiff's daily activities. (*Id.* at 155.) The investigator did not observe any activity by plaintiff on either December 8 or December 12. (*Id.* at 156, 158–59.) On December 11, having first arrived at 6:20 a.m., the investigator was able to observe plaintiff outside his residence from 9:57 a.m. until 10:00 a.m. (*Id.* at 157.) During this three minute interval the investigator observed plaintiff driving a green John Deere tractor near the cow pasture. (*Id.*) Plaintiff exited the tractor and spread hay over a portion of the field for the cows to graze upon. (*Id.*) Plaintiff then reentered the tractor and drove to another location on the property, out of the investigator's view. (*Id.*) According to the investigator, the plaintiff "moved in a fluid and natural manner in

exiting and entering the tractor" and was not wearing any medical braces to support his movements. (*Id.*) At 10:11 a.m. the investigator conducted a canvas of the area and did not see plaintiff driving the tractor. No further activity was observed on the 11th. (*Id.* at 157.)

On January 3, 2001, the Aetna Medical Director decided to order additional surveillance and to have plaintiff undergo a new combined IME and FCE. This new exam was conducted by Dr. Ralph D'Auria, an orthopedist selected by Aetna. (*Id.* at 16.) The order form for this visit states that Aetna wanted to know about plaintiff's, "functionality not his disease. What can this person do—activities of daily living." (*Id.* at 161.) The Medical Director re-authorized plaintiff's LTD benefits through March 31, 2001, in order to provide time to receive and review the new surveillance and IME/FCE reports. (*Id.* at 16.)

The additional surveillance of plaintiff was conducted on January 8, 30, and 31, 2001. (*Id.* at 390.) On January 8 and January 31, plaintiff did not leave his residence, and the investigator did not observe any activity by plaintiff. (*Id.* at 391–92, 394.) On January 30, the investigator observed plaintiff traveling to a scheduled medical examination in an Oldsmobile Delta 98 sedan. (*Id.* at 392.) Plaintiff's wife drove him to the appointment, and when they arrived at the medical office, plaintiff moved from his vehicle to the building, "in a slow manner exhibiting a very poor posture in his movements." (*Id.* at 393.) After plaintiff's appointment, his wife drove him to Captain D's Seafood Restaurant, where they ate. (*Id.*) Plaintiff's wife then drove him home, and the investigator did not see him again that day. (*Id.*)

On January 30, 2001, plaintiff underwent a combined IME and FCE by Dr. D'Auria. (*Id.* at 162.) Plaintiff informed Dr. D'Au-ria that he had difficulty with sitting for more than a half hour or standing for more than 15–20 minutes or walking for more that 15–20 minutes. (*Id.* at 164.) Plaintiff also stated that he had difficulty with any significant lifting and that he avoided all but "trivial lifting." (*Id.*) Plaintiff reported that his usual day involved:

> awakening around 8:00 a.m., going outside and feeding dogs and horses; then taking breakfast and riding around on his tractor on the farm, checking 130 head of cattle that he owns; and then going back into the house, watching TV and napping at about 11:00 a.m. for about a couple of hours. He then arises to take lunch and then he may do some phone work or TV and then travel in and out of the house, doing trivial piddling activities until supper and then after supper dozing off and then piddling about a bit more until bedtime at approximately midnight.

(*Id.*)

Dr. D'Auria thoroughly evaluated plaintiff "from an orthopedic rehabilitation standpoint" and determined that plaintiff had extensive limitations due to his rheumatoid arthritis. (*Id.* at 166.) According to Dr. D'Auria, plaintiff was unable to perform any climbing, crawling, kneeling, lifting, pushing, or pulling. (*Id.*) Plaintiff could occasionally reach above the shoulder to perform some forward reaching and some carrying. (*Id.*) Plaintiff was not able to perform any bending or twisting of the spine. (*Id.*) Plaintiff's hand grasping was normal but should not be performed on a consistent basis due to his arthritis. (*Id.*) Dr. D'Auria indicated that firm hand grasping should be avoided so as to avoid overloading the small joints of the hand that were susceptible to further damage. (*Id.*) Plaintiff could sit frequently without restrictions but could not stoop at all. (*Id.*) Plaintiff could walk frequently with

no major concerns but could only lift between three and five pounds. (*Id.* at 166–67.) Plaintiff should avoid frequent rotation of his neck. (*Id.* at 167.) Dr. D'Auria concluded:

Duration of these restrictions are permanent and the patient is unable to return to his original work indefinitely. No employability is foreseen at this time, at least, within the parameters of his previous occupation. The only possibility of employability at this time is performing part-time (no more than 4–6 hours per day) sedentary work that does not involve any of the above mentioned activities that are recommended to be avoided. A sedentary position should be sought after.

(*Id.*) Dr. D'Auria added that plaintiff's cooperation and effort during the exam were acceptable for his condition and that the consistency of his performance was also acceptable. (*Id.*) Dr. D'Auria "did not find any signs of any pain behavior exaggeration or magnification of any symptoms." (*Id.*)

Dr. D'Auria also completed an FCE report based on plaintiff's January 30 visit. (*Id.* at 168–73.) According to this report, plaintiff demonstrated that he was able to sit with significant interruptions for an hour and five minutes with six interruptions at six to fourteen minute intervals to stand. (*Id.* at 171.) Plaintiff was able to stand for twenty-one minutes, but this was interrupted by sitting twice during the course of that time, secondary to low back and leg pain. (*Id.*) Dr. D'Auria stated that plaintiff's FCE "indicates he is not capable of working at the sedentary PDC level as he is unable to lift 10 pounds through full range of motion. He has postural restrictions that include sitting and standing and require frequent interruption from both these postures." (*Id.* at 172.) As part of the FCE, Dr. D'Auria also completed an

"Employability and Impairment Summary Form" in which he stated that plaintiff was, "unable to return to his job or any gainful occupation." (*Id.* at 174.) Finally, Dr. D'Auria completed a "Functional Capacity Worksheet" in which he stated that plaintiff's restrictions were permanent and that he was, "unable to return to work indefinitely." (*Id.* at 175.)

Though Dr. D'Auria's medical examination stated unequivocally that plaintiff's restrictions were "permanent" and indicated only a "possibility" of sedentary work for no more than four to six hours her day, (*Id.* at 167), on February 14, 2001, Dr. Bonner interpreted Dr. D'Auria's IME as releasing plaintiff to restricted work. At the same time, Dr. Bonner noted an apparent inconsistency between the IME and FCE, because Dr. D'Auria found plaintiff to be unable to perform any level of work "although the functional capacities form provided [by Dr. D'Auria] does indicate very limited work capacity." (*Id.* at 18.) However, given plaintiff's admission that he performed some farm work and surveillance confirmation that he did so, Dr. Bonner was, "inclined to disregard Dr. D'Auria's findings of 'total disability.' By his actions [plaintiff] confirms that he is capable of performing some level of work, driving a tractor and moving hay [are] certainly heavier tasks than performing sedentary PDC work." (*Id.*) In an effort to resolve these apparent inconsistencies, Dr. Bonner directed that Dr. D'Auria be sent a questionnaire to clarify his findings. (*Id.* at 19, 251.) Dr. Bonner posed these three questions to Dr. D'Auria, which were sent on February 16, 2001:

1) Do you believe Mr. Byrom's report that he drives farm equipment (a tractor), moves hay and feeds his cows on a regular basis? We have surveillance information that he does, in fact, perform these activities. Doesn't this indicate

that he retains some work capacity? Does this admission indicate a work capacity that is at least sedentary (partial hours) given that the reported activities are above sedentary PDC work[?]

2) In your IME you indicate that Mr. Byrom could perform limited sedentary work and the FCE evaluation provides a functional capacities form that indicates a 4 to 8 hour work day (answer to item I.) However your final conclusion is that he can not work? Please clarify these conclusions.

3) Could Mr. Byrom perform limited work for a few hours a day, several days per week?

(*Id.* at 19.)

Dr. D'Auria's response, via letter,[4] "apologize[d] for the inconvenience caused by some degree of lack of clarity on my part concerning my report." (*Id.* at 176.) Dr. D'Auria stated that the plaintiff had volunteered the fact that he drives farm equipment, although Dr. D'Auria did not "know exactly to what extent he has been conducting those activities." (*Id.*) Despite an admitted lack of knowledge as to the extent of plaintiff's farm activities, Dr. D'Auria concluded, "[t]his is definitely an indication that [plaintiff] does have some work capacity of, at least, sedentary work level and certainly in going over the results of the FCE, above the sedentary work PDC level." (*Id.*) Though the previously issued IME discussed only the "possibility" of a four to six hour work day, Dr. D'Auria's response to Aetna's inquiry stated, "[a]ccording to the results of the FCE, [plaintiff] does have the capacity of performing a 4–8 hour day of work and for some reason the wrong conclusion was issued regarding [plaintiff] not being able to work." (*Id.*) In

the end, without any additional examination or explanation for the change, Dr. D'Auria requested that the records be corrected as follows: "**MR. JAMES BYROM IS ABLE TO WORK IN AN ABOVE SEDENTARY PDC WORK LEVEL.** He can work anywhere from 4–8 hours, several days a week over the course of a 4–5 day week. This is based on the results of the FCE." (*Id.* (emphasis in original).)

Based on Dr. D'Auria's letter of clarification, Dr. Bonner concluded on February 26, 2001, that plaintiff was able to perform some level of work. (*Id.* at 20.) On March 1, 2001, Aetna contacted plaintiff and informed him that he would be denied LTD benefits effective March 6, 2001, due to the IME/FCE done in January 2001. (*Id.* at 252.) In a letter dated May 1, 2001, plaintiff formally appealed this denial to Aetna. (*Id.* at 184.) Plaintiff argued that the fact he rode his tractor for five to ten minutes on some days and occasionally fed his horse two pounds of sweet feed did not indicate that he was able to work in any gainful occupation. (*Id.*)

In support of his appeal, plaintiff submitted several letters. In a letter dated April 19, 2001, Dr. Adrian Douglass, plaintiff's internist, stated that plaintiff's severe symptoms stemming from his rheumatoid arthritis had led to a bout of severe depression for which Dr. Douglass treated him. (*Id.* at 186.) Dr. Douglass stated that plaintiff "should be deemed totally disabled based on his multiple physical as well as mental illnesses." (*Id.* at 187.) In a letter dated April 3, 2001, Dr. Singh, plaintiff's rheumatologist, stated that "riding a tractor 5–10 minutes per day (and not every day) does not constitute an ability to

4. Though the letter is dated January 21, 2001, this cannot be correct, as Dr. D'Auria's initial exam of plaintiff did not occur until January 30, 2001. Given that the questionnaire was faxed to Dr. D'Auria on February 16, 2001, a reply date of February 21 would seem to be more accurate. (*See* A.R. at 19, 176.)

perform any gainful employment. In my medical opinion, I still contend that [plaintiff] is unable to perform any gainful employment and I do not foresee this condition changing in the future." (*Id.* at 188.) In a letter dated April 6, 2001, Dr. Anthony T. Clavo, plaintiff's pain management specialist, stated that plaintiff had a "long history of chronic pain, exacerbated by work activities." (*Id.* at 189.) Finally, plaintiff submitted letters from two of his neighbors. In a letter dated March 15, 2001, neighbor Joe Stewart indicated that he had helped plaintiff feed his cows for the last two years and had, "probably done more than him to keep up the farm because of his condition. There are some weeks he can't even get out of bed." (*Id.* at 190.) Similarly, neighbor Paul Jones indicated that it was extremely hard for plaintiff to feed his cattle and horses so, "[m]yself and another neighbor must handle this for him." (*Id.* at 191.)

In a letter dated June 26, 2001, Dr. Paul J. Healey, Sr., an Aetna Medical Director, advised plaintiff that his appeal was denied. (*Id.* at 25–27.) In his denial letter, Dr. Healey indicated that the IME performed by Dr. D'Auria found plaintiff to be capable of performing modified work based on his examination and an FCE. (*Id.* at 26.) Dr. Healey went on to comment, "[t]he surveillance supports this conclusion, documenting you being physically active on your farm." (*Id.*) Aetna recognized that Dr. Douglass, Dr. Singh, and Dr. Clavo supported plaintiff's disability, but "none of these three physicians provide[d] recent (last six months) clinical records nor [did] they provide a functional assessment of [plaintiff's] condition." (*Id.*) Dr. Healey concluded that "[b]ased on the clinical information available for review, there is insufficient objective medical evidence to support a condition of total disability from any occupation, including part time, and

therefore, we are maintaining our denial." (*Id.*)

Plaintiff appealed the decision to the Administrative Committee of Delta Airlines in a letter dated September 10, 2001. (*Id.* at 273.) Plaintiff stated that there was nothing that he would like better than to be able to return to work for the airline that he loved and to which he had dedicated much of his life but that he was unable to do so. (*Id.*) In support of his appeal, plaintiff submitted a letter from Dr. Singh dated August 29, 2001. (*Id.* at 275.) Dr. Singh stated that just because plaintiff was able to ride his tractor for a few minutes on some days and because he performed acceptably on some areas of an FCE did not mean that he was physically able to work on a regular basis. (*Id.*) According to Dr. Singh, plaintiff's case is "quite complicated and the prognosis for any improvement is not good. Any attempt at working on any kind of a part-time or regular basis will do nothing more than cause him to become acutely symptomatic." (*Id.*) Dr. Singh stated that plaintiff was taking the strongest medications available but that, in his opinion, plaintiff was in "the 3% of male cases that suffer from Rheumatoid arthritis and never get better but, instead become progressively worse." (*Id.*)

In a letter dated January 11, 2002, Brian A. King, Secretary of the Administrative Committee, informed plaintiff that the Committee had denied his appeal. (*Id.* at 242–59.) Mr. King stated that plaintiff's claim for disability stemmed from his multiple physical problems, which indisputably prevented him from returning to his former job. (*Id.* at 257.) Plaintiff's ability to return to his former job was not the standard used for determining long-term disability under the Plan; instead, the standard was plaintiff's ability to perform any job, including part-time work. (*Id.*) Mr.

King noted that plaintiff's treating physicians, Dr. Douglass, Dr. Singh, and Dr. Clavo, and an IME physician selected by Aetna, Dr. Gottlieb, all concluded plaintiff was disabled. (*Id.*) On the other hand, Mr. King pointed out that, "[t]he FCE and Dr. D'Auria concluded that [plaintiff was] not disabled within the meaning of the Plan." (*Id.*)

According to Mr. King, the Committee considered a number of factors in attempting to resolve this dispute regarding whether plaintiff qualified for disability. (*Id.*) Specifically, Mr. King stated:

> The Committee noted that surveillance and your statements indicated that you were working on your property in an, apparently, profit making enterprise by feeding your cows and your horse. The degree to which you were engaged in these activities is unclear, though the Committee concluded that this activity was not insignificant. As such, it appeared to the Committee that you were not only *able* to engage in an occupation for compensation for profit, but that you actually *did* engage in an occupation for profit.
>
> The Committee noted that Dr. D'Auria's initial opinion was contradictory. On the one hand, he noted restrictions that are consistent with an ability to work at least part-time.... On the other hand, in a conclusory statement, he said that you were unable to work at all. Given this inconsistency, it was appropriate for the Medical Director to request a clarification from Dr. D'Auria. Dr. D'Auria's clarification made it clear that he believed that you were able to work in a part time sedentary position. The contradiction in his statements, however, did effect the weight given to Dr. D'Auria's opinion by the Committee.
>
> The Functional Capacity Examination also suggested that you were capable of

working in a part time, sedentary position. The results of the FCE· combined with the surveillance and your statements about your farm work overcame any problems with Dr. D'Auria's opinion in the minds of the Committee. Moreover, your ability to perform work on your farm also overrode the opinions of your treating doctors and Dr. Gottlieb in the view of the Committee. Accordingly, the Committee voted to uphold the denial of benefits in your case.

(*Id.* at 258–59 (emphasis in original).) Having exhausted all appeals, plaintiff filed this lawsuit on June 17, 2003. (Compl. [1] at 1.)

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548; *Apcoa, Inc. v. Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir.1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[5] designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Nat'l Parks Conservation Ass'n v. Norton,* 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Electric In-*

*dus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every element material to that party's case so as to create a genuine issue for trial.

## II. *Standard of Review*

 Plaintiff brings this action as a beneficiary of an ERISA plan against the defendant's claims administrator, the Administrative Committee of Delta Air Lines, to recover benefits allegedly due to him under the terms of the long term disability policy. 29 U.S.C. § 1132(a)(1)(B). A denial of ERISA benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is reviewed under a *de novo* standard unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If an ERISA plan does confer discretionary authority on the plan administrator to make eligibility decisions or to construe disputed terms of the plan, a court reviews its decisions under an arbitrary and capricious standard of review, which is often used interchangeably with an abuse of discretion standard. *Hunt v. Hawthorne Assocs., Inc.,* 119 F.3d 888, 912 (11th Cir.1997) (citing *Jett v. Blue Cross & Blue Shield of Ala.,* 890 F.2d 1137, 1139 (11th Cir.1989)). If a benefit plan gives discretion to an administrator who is operating under a conflict of inter-

---

5. The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

est, that conflict must be weighed as a factor in determining whether there is an abuse of discretion. *Firestone,* 489 U.S. at 115, 109 S.Ct. 948 (citation omitted). Where the administrator suffers from a conflict of interest in making its determination, the court should apply a heightened arbitrary and capricious standard. *Hunt,* 119 F.3d at 912 (citations omitted).

Thus, the Eleventh Circuit has adopted the following standards for reviewing administrators' ERISA plan interpretations: (1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest. *Buckley v. Metro. Life,* 115 F.3d 936, 939 (11th Cir.1997) (citation omitted).

■ The Court must look "to the plan documents to determine whether the plan documents grant the claims administrator discretion to interpret disputed terms." *HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 993 (11th Cir.2001). To trigger a heightened standard of review, "the language conferring discretion on the administrator must be 'express language unambiguous in its design.'" *Hunt,* 119 F.3d at 912 (quoting *Kirwan v. Marriott Corp.,* 10 F.3d 784, 789 (11th Cir.1994)). In the instant case, the Plan provides that the Administrative Committee has:

> [t]he discretionary authority to interpret and construe the Plan, and decide all questions of eligibility of any Eligible Family Member to participate in the Plan or to receive benefits under it, its interpretation and decisions to be final and conclusive...

(DSMF at ¶ 5.) Further, the Plan provides the Administrative Committee with "the broadest discretionary authority permitted under law in the exercise of all of its functions including, but not limited to, deciding questions of eligibility, interpretation, and the right to benefits..." (*Id.*) The plan thus contains express language conferring discretionary authority upon the administrator to construe its terms, triggering a heightened standard of review. *See Turner v. Delta Family–Care Disability and Survivorship Plan,* 291 F.3d 1270, 1273 (11th Cir.2002) (holding that "the arbitrary or capricious standard of review applies to this Plan's decisions because of the broad discretions delegated to the Plan's Administrator in the Plan document"); *see also Hunt,* 119 F.3d at 912 (citations omitted).

Moreover, under the Plan, benefits are paid from a trust funded through periodic, non-reversionary contributions by Delta. (DSMF at ¶ 7.) Thus, Delta incurs no direct expense as a result of the allowance of benefits, nor does it benefit directly from the denial or discontinuation of benefits. *See Buckley,* 115 F.3d at 939–40. The Eleventh Circuit has therefore held that "the funding structure utilized by this Plan eradicates any alleged conflict of interest so that the arbitrary or capricious standard of review applies." *Turner,* 291 F.3d at 1273.

In sum, the Court's review of the Plan documents convinces it that the arbitrary and capricious standard should apply in this case. Second, the Eleventh Circuit has explicitly held that the arbitrary and capricious standard applies to this Plan. *See id.* Third, the parties agree that the arbitrary and capricious standard applies. (Defs.' Mot. for Summ. J. [16] at 14–15; Pl.'s Mem. in Supp. of Mot. for Summ. J. [17] at 13.) The Court will therefore apply the arbitrary and capricious standard here.

The Court's scrutiny under the arbitrary and capricious standard is limited to determining whether the challenged decision

has a rational, good faith basis. *Cagle v. Bruner*, 112 F.3d 1510, 1518 (11th Cir. 1997) (citing *Blank v. Bethlehem Steel Corp.*, 926 F.2d 1090, 1093 (11th Cir.1991)); *see also Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1564 (11th Cir.1990) (denial is not arbitrary and capricious unless it is "completely unreasonable"); *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 39 (11th Cir.1989) (under the arbitrary and capricious standard, the court may determine if decision was rational regardless of whether it was "right"). As stated by the Eleventh Circuit:

> In reviewing a termination of benefits under the arbitrary and capricious standard, the function of a reviewing court is to discern whether there was a reasonable basis for the decision, relying on the facts known to the administrator at the time the decision was made.

*Buckley*, 115 F.3d at 941 (citing *Jett*, 890 F.2d at 1139). This standard applies to both questions of plan interpretation and factual findings. *Shaw v. Connecticut Gen. Life Ins. Co.*, 353 F.3d 1276, 1285 (11th Cir.2003) (citations omitted); *see also Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir.1997) ("[W]e consistently have upheld application of the abuse of discretion standard of review to determinations involving both plan interpretations and factual findings under ERISA.").

### III. *Application of the Arbitrary and Capricious Standard*

 The Court has reviewed the pleadings and administrative record in this case and, if asked to reach its own conclusion, would readily find plaintiff disabled to such a degree as to continuously and totally prevent plaintiff from engaging in any occupation whatsoever, for compensation or profit, including part-time work.[6] However, under the arbitrary and capricious standard of review, the Court's recognition of plaintiff's disability is irrelevant. Instead, the Court may ask only whether the Administrative Committee's decision to deny plaintiff LTD benefits has a rational, good faith basis. *See Cagle*, 112 F.3d at 1518. The Court does not inquire whether the Committee's decision was "right". *See Guy*, 877 F.2d at 39. In undergoing this analysis, the Court recognizes that a denial of benefits is not arbitrary and capricious unless it is completely unreasonable based on the facts known to the administrator at the time the decision was made. *See Brown*, 898 F.2d 1556; *Buckley*, 115 F.3d at 941.

Applying the arbitrary and capricious standard of review to the facts presented in this case, the Court concludes that the Administrative Committee's decision to discontinue plaintiff's LTD benefits was unreasonable, based on the facts known to the Committee at the time the decision was made. In the letter denying plaintiff's appeal for LTD coverage, the Administrative Committee spelled out the factual elements it reviewed in reaching its decision. (A.R. at 258–59.) The Court has reviewed these factual elements and additional evidence from the administrative record that was available to the Committee at the time of its decision. Having done so, the Court is unable to discern a rational relationship between the evidence in this case and the Committee's decision to deny plaintiff his benefits. A review of the statement of facts in this case, distinguishing between those facts that are generally favorable to plaintiff and those facts that are generally

---

**6.** Under Section 4.3 of the Plan plaintiff is entitled to LTD benefits if his disability, "will continuously and totally prevent him from engaging in any occupation whatsoever for compensation or profit, including part-time work." (DSMF at ¶ 2.)

favorable to defendants suggests the unreasonableness of the Committee's conclusion.

## A. Evidence Generally Favorable to Plaintiff

### 1. Plaintiff's Treating Physicians

By the time plaintiff contacted Aetna in March 2000, he had been out of work for four months. (PSMF at ¶ 7.) This absence, and accompanying application for benefits, came after a more than twenty year career with Delta Air Lines, and at least nine years after plaintiff had been diagnosed with rheumatoid arthritis. (PSMF at ¶ 2; A.R. at 28.) At the time, and as the Committee recognized, plaintiff's treating physicians and the rheumatologist selected by Aetna all concluded that plaintiff was disabled. (A.R. at 257.)

In April 2000, plaintiff's rheumatologist, Dr. Singh, reported to Aetna that plaintiff was totally disabled and could not perform even part-time sedentary work. (*Id.* at 243.) On August 8th of that same year, Dr. Singh echoed his initial report in a letter admitting that, despite aggressive treatment with several different medications, he was unable to gain control over plaintiff's rheumatoid arthritis. In the same letter Dr. Singh indicated that if plaintiff returned to work on even a part-time basis in a sedentary job it would, "significantly flare-up his rheumatoid arthritis and if he does indeed live to be old, there will be no quality to his life." (*Id.* at 52.) In April 2001, Dr. Singh reiterated these conclusions again in a letter stating, "[i]n my medical opinion, I still contend that [plaintiff] is unable to perform any gainful employment and I do not foresee this condition changing in the future." (*Id.* at 188.) Dr. Singh was not alone in his conclusions.

According to plaintiff's general internist, Dr. Douglass, plaintiff struggles with the "ravages" of rheumatoid arthritis, as well as left lower extremity sciatica. (*Id.* at 78.) Indeed, in a letter dated August 10, 2000, Dr. Douglass concluded that plaintiff maintained "a significant element of disability which would prevent him from working," in part because prolonged sitting and standing were a "very difficult proposition" for plaintiff. (*Id.*) In Dr. Douglass's second letter to the Committee, on April 19, 2001, he maintained his opinion that plaintiff was totally disabled. (*Id.* at 186.) Finally, on April 6, 2001, plaintiff's pain management specialist, Dr. Clavo, indicated that plaintiff had "chronic pain syndrome." (*Id.* at 189.)

In *Black & Decker Disability Plan v. Nord,* the Supreme Court declined to extend the Social Security "treating physician rule" that accords special weight to the opinions of Social Security claimant's treating physicians to disability determinations under employee benefits plans covered by ERISA. 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Defendants argue that based on this decision, the Plan was not required to give the opinions of plaintiff's physicians any deference. (Defs.' Mot. for Summ. J. [16] at 19.) While it is true that plan administrators do not have to accord *extra* respect to the opinions of treating physicians, *Black & Decker* is not license for plan administrators to *ignore* the opinions of a claimant's doctors. Instead, the *Black & Decker* court, itself, recognized that, as a rule, compared to consultants retained by a plan, treating physicians may have a greater opportunity to know and observe the patient as an individual. *Id.* at 832, 123 S.Ct. 1965. Thus, even as the Supreme Court refused to extend the "treating physician rule" to the ERISA context, the Court cautioned, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including

the opinions of a treating physician." *Id.* at 834, 123 S.Ct. 1965.

Here, the Plan gave some credit to Dr. Singh's medical opinion in making its initial decision to grant plaintiff twenty-six weeks of short-term disability benefits and LTD benefits from July 5, 2000, through December 31, 2000. Ultimately, however, the Committee totally disregarded all of the treating experts' conclusions that plaintiff was disabled and unable to work, in any position. Instead, the Committee concluded that plaintiff was able to work and, accordingly, denied LTD benefits. If the statements of plaintiff's treating physicians were the only evidence before the Committee, the decision to deny benefits would certainly be unreasonable, but here there was more evidence for the Committee to consider. Because this Court seeks to uphold any Plan decision "made rationally and in good faith", *Cagle,* 112 F.3d at 1518, the Court turns now to some of this other evidence in an effort to discern reasonableness in the Committee's ultimate conclusion to deny benefits.

### 2. Examination by Aetna's Own Selected Expert, Dr. Gottlieb

After approving plaintiff for short-term disability, Aetna ordered plaintiff to submit to an IME with Dr. Gottlieb, a rheumatologist selected by Aetna. (A.R. at 243.) After conducting the examination on April 24, 2000, Dr. Gottlieb diagnosed plaintiff with erosive rheumatoid arthritis. Dr. Gottlieb characterized plaintiff's disease as "very difficult to control", and noted that plaintiff's "significant pulmonary disease" was a complicating factor. (*Id.* at 29.) In conclusion, Dr. Gottlieb found that plaintiff was, "completely disabled and unable to do any kind of work, including sedentary activities." (*Id.*) Dr. Gottlieb went on to characterize the length of plaintiff's disability as indefinite and indicated

that plaintiff would be unable to return to any gainful work. (*Id.* at 31.)

Although Dr. Gottlieb was the Plan's own independent consultant, defendants ignored his opinion. (*See id.* at 257–58.) Once again, if the statements of plaintiff's treating physicians and Dr. Gottlieb's IME were the only evidence before the Committee, the decision to deny benefits would certainly be unreasonable. Therefore, the Court must continue to look elsewhere in its attempt to find reasonableness in the Committee's decision.

### 3. Social Security Administration Disability Award

A month after plaintiff submitted to the IME with Dr. Gottlieb, the Social Security Administration informed plaintiff that he was considered disabled as of October 30, 1999, and was entitled to disability benefits based on that disability start date. (*Id.* at 425.) Defendants correctly argue that the standard for Social Security disability benefits is different than the standard for LTD benefits under the Plan. (Defs.' Mot. for Summ. J. [16] at 21.) Indeed, an award of Social Security benefits is not dispositive on the issue of whether or not an individual is disabled. *Paramore,* 129 F.3d at 1452 n. 5. As defendants note, the standard for deciding a Social Security case differs a great deal from the standard applicable to the denial of disability by an ERISA plan. (Defs.' Mot. for Summ. J. [16] at 21.) Nevertheless, a court, "may consider [a Social Security disability award] in reviewing a plan administrator's decision regarding eligibility for benefits under an ERISA-governed plan." *Paramore,* 129 F.3d at 1452 n. 5.

In the end, while the Social Security disability award may not necessarily have led the Committee to conclude that plaintiff was disabled under the Plan, the Social Security Administration's finding could not

conceivably have weighed against plaintiff. In sum, if the statements of plaintiff's treating physicians, Dr. Gottlieb's IME, and the Social Security disability award were the only evidence before the Committee, the decision to deny benefits would certainly be unreasonable. Consequently, the Court's search for reasonableness continues.

### 4. Examination by Aetna–Selected Expert, Dr. D'Auria

On January 3, 2001, Aetna's Medical Director ordered plaintiff to complete a new combined IME and FCE with Dr. D'Auria, an orthopedist selected by Aetna. (*Id.* at 16.) This exam took place on January 30, 2001. (*Id.* at 163.) It was during this exam that plaintiff first volunteered that he spent some time riding his tractor around his farm. In the sane breath, plaintiff indicated that though he rose at 8:00 a.m., he was back in the house "piddling" and taking a nap by 11:00 a.m. (*Id.* at 164.)

After evaluating plaintiff from an orthopedic rehabilitation standpoint, Dr. D'Auria determined that plaintiff had extensive limitations. (*Id.* at 166.) Indeed, plaintiff was unable to perform any climbing, crawling, kneeling, lifting, pushing, or pulling. (*Id.*) Dr. D'Auria noted that plaintiff's hand grasping was normal, but indicated that such activity should not be performed on a consistent basis because of the arthritis. (*Id.*) Plaintiff was also to avoid frequent rotation of his neck. (*Id.* at 167.) After indicating that plaintiff's cooperation and effort during the exam were acceptable for his condition, Dr. D'Auria's IME concluded, "[d]uration of these restrictions are permanent and the patient is unable to return to his original work indefinitely … the only possibility of employability at this time is performing part-time (no more than 4–6 hours per day) sedentary work

that does not involve any of the above mentioned activities that are recommended to be avoided." (*Id.*) Alone, this statement would seem to suggest that plaintiff was capable of performing sedentary work, but the FCE completed by Dr. D'Auria on the same day states that plaintiff, "is not capable of working at the sedentary PDC level as he is unable to lift 10 pounds through full range of motion." (*Id.* at 172.) Dr. D'Auria went on to say that plaintiff was "unable to return to his job or any gainful occupation," and was "unable to return to work indefinitely." (*Id.* at 174–75.)

Though Aetna would later seek clarification on the discrepancy between Dr. D'Auria's statement that plaintiff could possibly perform sedentary work for 4–6 hours per day and his conclusion that plaintiff was unable to return to work at any gainful employment, Dr. D'Auria's *initial* IME and FCE, with their inconsistencies and confirmation of plaintiff's impairments, do not support the Committee's denial of plaintiff's disability benefits. Because the Court concludes that the statements of plaintiff's treating physicians, Dr. Gottlieb's IME, the Social Security disability award, and Dr. D'Auria's initial IME and FCE do not provide a rational, good faith basis for the Committee's decision, the Court must delve further into the administrative record in an effort to find reasonableness.

### 5. Five out of Six Days of Surveillance

In total, Aetna ordered six days of surveillance of plaintiff to determine the extent of his daily activities. The first three days of surveillance took place on December 8, 11, and 12, 2000. (*Id.* at 155.) The second block of surveillance took place on January, 8, 30, and 30, 2001. (*Id.* at 390.) On December 8th, December 12th, January 8th, and January 31st, plaintiff did not

leave his residence, and the investigator did not observe any activity by plaintiff. (*Id.* at 156, 158–59, 391–392, 394.) On January 30th, plaintiff left home to travel to the medical examination that Aetna had scheduled with Dr. D'Auria. On that day, plaintiff's wife drove him to his appointment, and plaintiff was observed traveling from his vehicle to the medical building, "in a slow manner exhibiting a very poor posture in his movements." (*Id.* at 393.) After the appointment, plaintiff and his wife drove to Captain D's Seafood to eat and then returned home. (*Id.*) The investigator observed no further activity on the 30th. (*Id.*)

Plaintiff's activities on December 11th will be addressed by the Court in its discussion of evidence arguably favorable to defendants, but the totality of the investigator's report reveals plaintiff to have been homebound on four out of six randomly selected days. Furthermore, on the fifth day plaintiff's activity was limited to travel to a doctor's appointment that was ordered by defendants. Aetna's overall surveillance therefore tends to support, or at least not contradict, a conclusion that plaintiff was disabled. Still, because the Court reviews the Committee's decision only for abuse of discretion, the Court's continues to search for a reasonable basis for denying plaintiff his benefits.

### 6. Statements of Plaintiff's Neighbors

In support of his appeal, plaintiff submitted letters from two long-time neighbors, Joe Stewart and Paul Jones. In March 2001, Neighbor Stewart stated that, because of plaintiff's declining health, he had helped plaintiff feed his cows for the last two years and had, "probably done more than him to keep up the farm because of his condition." (*Id.* at 190.) At the same time Neighbor Jones echoed this same sentiment in a statement indicating

that it was extremely hard for plaintiff to feed his cattle and horses so, "[m]yself and another neighbor must handle this for him. We share the load that Larry has undertaken all his life. Sometimes when we are out of town then he must do them if he can. When he does have to handle these things, then he puts his body under enormous pain." (*Id.* at 191.)

The Committee elected to consider this information in reaching its decision. (*Id.* at 242, 255.) Accordingly, the Court must consider whether anything in either of these neighbor statements supports the decision to deny plaintiff LTD benefits. Obviously, they do not.

Therefore, having exhausted the evidence in support of plaintiff without finding a conceivably reasonable basis for the Committee's denial of plaintiff's appeal for LTD benefits, the Court turns to a consideration of evidence generally favorable to defendants in an attempt to find a rational, good faith basis for the Committee's decision.

### B. Evidence Generally Favorable to Defendants

### 1. Farming Activity

On December 11, 2000, the investigator conducting surveillance on plaintiff's residence observed plaintiff outside his home. Having arrived at plaintiff's residence at 6:20 that morning the investigator did not observe any activity until 9:57 a.m. (*Id.* at 157.) From 9:57 a.m. until 10:00 a.m., the investigator watched plaintiff drive his John Deere tractor near his cow pasture. (*Id.*) Plaintiff was observed exiting the tractor to spread hay over a portion of the field and appeared to the investigator to move in, "a fluid and natural manner in exiting and entering the tractor." (*Id.*) After spreading hay on the field, plaintiff drove the tractor to another location on the property out of the investigator's view. By 10:11 a.m. the investigator was unable

to observe any additional activity. The investigator continued to conduct surveillance until 4:49 p.m. but observed no further activity on the part of plaintiff. (*Id.*)

In its letter informing plaintiff that his appeal was denied, the Committee focused a great deal on this three minutes of observed activity. The Committee combined plaintiff's surveillance record, in which four out of five days showed plaintiff to be homebound, with plaintiff's statement to Dr. D'Auria that he fed dogs and horses and rode his tractor from 8:00 a.m. to 11:00 a.m. to conclude:

> The Committee noted that surveillance and your statements indicated that you were working on your property in an, apparently, profit making enterprise by feeding your cows and your horse. **The degree to which you were engaged in these activities is unclear, though the Committee concluded that this activity was not insignificant.** As such, it appeared to the Committee that you were not only *able* to engage in an occupation for compensation or profit, but that you actually *did* engage in an occupation for profit ... The results of the FCE combined with the surveillance and your statements about your farm work overcame any problems with Dr. D'Auria's opinion in the minds of the Committee. Moreover your ability to perform work on your farm also overrode the opinions of your treating doctors and Dr. Gottlieb in the view of the Committee ... Accordingly, the Committee voted to uphold the denial of benefits in your case.

(*Id.* at 258–59 (bold emphasis added).)

In crediting the *three minutes* of surveillance and plaintiff's candid statement to Dr. D'Auria, the Committee effectively discarded plaintiff's amplification of this activity made by plaintiff in his May 1, 2001, formal appeal letter. In that letter plaintiff stated:

> I was completely honest when I told Dr. D'Auria that I occasionally rode the tractor around the farm and on occasion, attempted to feed animals. Truthfully, though Dr. D'Auria did not ask, I ride the tractor maybe 5–10 minutes per day and certainly not every day. I have an old horse that is 27 years old and has to be fed special "sweet" feed. My wife, Crystal, feeds this horse occasionally. On some occasions, if I possibly can, I carry the appx.(sic) 2 lbs. of food about 100 feet from my house to this animal. By no means does this indicate that I am able to work in any gainful occupation.

(*Id.* at 184.)

The Committee indicated that plaintiff's "[farming] activity was not insignificant" in the Committee's decision-making process. (*Id.* at 259.) If plaintiff was, in fact, farming even part-time each day, the Court would deem reasonable the Committee's conclusion that plaintiff was capable of engaging in some occupation for compensation or profit.[7] Yet, the administrative record *does not support a conclusion that plaintiff could engage in a farming occupation on a part-time or full-time basis.* Instead, the record indicates that plaintiff gave a general statement about his typical morning routine to Dr. D'Auria, clarified in a later letter in which plaintiff stated that he rode his tractor "maybe 5–10 minutes

---

7. In order for plaintiff to have received LTD benefits his disability must have, "continuously and totally prevent[ed] him from engaging in any occupation whatsoever for compensation or profit, including part-time work." *See* § 4.03 of the Plan. Because the Committee denied plaintiff's appeal for LTD benefits, they must have concluded that plaintiff was capable of engaging in some occupation for compensation or profit.

per day and certainly not every day." (*Id.* at 184.) Corroborating plaintiff's ready acknowledgment that he spent a limited amount of time in his field on a sporadic basis is the surveillance report.

Without additional evidence of substantial or even semi-substantial farming activity, the Court is unable to discern how surveillance showing plaintiff on a tractor for three minutes combined with plaintiff's general statement to the same effect form a reasonable basis for deeming plaintiff capable of engaging in an occupation for compensation or profit. At the time plaintiff's appeal was denied, even the Committee recognized that the degree to which plaintiff was engaged in these activities was unclear. (*Id.* at 258.) Given that uncertainty, if the Committee had wanted to use plaintiff's sporadic farm activity as a basis for its denial of plaintiff's benefits, the Committee should have ordered additional surveillance that might have confirmed or dispelled these suspicions. In the absence of any other evidence to establish that plaintiff was actually engaging in farming as an occupation, or capable of doing so, the Committee's extrapolation of a short tractor ride on one day into a conclusion that plaintiff engaged in farming activities for profit appears, to this Court, to be quite a stretch. This conclusion leaves only two other avenues for discerning a rational basis for the Committee's decision: the HealthSouth FCE and Dr. D'Auria's letter of clarification.

### 2. HealthSouth FCE

On June 20–21, 2000, at Aetna's request, plaintiff underwent a two-day FCE. During the course of this FCE plaintiff walked with a lurch and demonstrated an uneven stop length. (*Id.* at 32.) During an exam of the cervical area and lumbar region, plaintiff demonstrated an immediate pain response. (*Id.* at 33.) In addition, plaintiff was unable to assume a safe lift position for the "shoulder-to-overhead" and "50–foot carry" evaluations. (*Id.* at 35.) However, plaintiff did demonstrate an ability to walk, climb stairs, bend and twist at the trunk, reach overhead, push/pull on an occasional basis, sit, and stand. (*Id.* at 32.) Based on these limited capabilities, Physical Therapist Shirley Head and Physical Therapist Assistant Jim Keith concluded that plaintiff, "could meet requirements of a job in the sedentary category as defined by the U.S. Department of Labor Work Classification Level in an eight-hour time period on a full-time basis. A job which would allow for frequent position changes between sitting and standing is recommended … it is felt that these are the minimal capabilities of the client and not the maximal capabilities." (*Id.*)

This FCE report provides some support for the Committee's denial of plaintiff's LTD benefits. To fairly evaluate the reasonableness of the Committee's ultimate decision to rely on this report to the exclusion of nearly all other evidence presented in the administrative record, the FCE report must be weighed against this other evidence. Focusing just on the FCE report alone, the physical therapist did conclude that plaintiff could work in a sedentary job on a full-time basis. Apparently, the physical therapist reached this conclusion because plaintiff was able to walk, climb stairs, and sit and stand during the tests given to him by the therapist or her assistant. That plaintiff might be able to perform these activities for a short duration during a physical therapist's test, however, does not convince the Court that he could do so on a sustained basis for an eight hour day. Indeed, as noted *supra*, the majority of medical evidence indicated that plaintiff could not engage in prolonged activity. *See, e.g.*, discussion *supra* at 1170 (Dr. Singh's opinion that even a part-time, sedentary job would cause a

flare-up of his arthritis and result in there being "no quality to his life.") The Court is uncertain on what basis a physical therapist might have reached a different conclusion, assuming that the therapist was even aware of Dr. Singh's and Dr. Gottlieb's opinions.

Moreover, the record indicates that plaintiff's performance before the physical therapist may have been artificially enhanced by epidural steroid injections that plaintiff had been receiving for severe back pain shortly before seeing the therapist.[8] (A.R. at 52.) Yet, plaintiff's treating rheumatologist had indicated that plaintiff could not continue to receive these injections because they had previously caused perforations of his ulcer that had required surgical correction. *Id.*

Under the arbitrary or capricious standard of review it is irrelevant whether the Committee's decision was the decision that the Court would reach, but the decision must still be rational and in good faith. *See Guy,* 877 F.2d at 39. Though the Court defers questions of judgment to the Plan, the Court deems unreasonable a decision that would credit a single FCE report prepared by a non-doctor over an IME issued by an Aetna-selected specialist, the opinions of plaintiff's treating physicians, the partial findings of an IME and FCE issued by a second specialist selected by Aetna, and the statements of plaintiff's neighbors. To hold otherwise would be to say that under the arbitrary and capricious standard of review, a plan administrator may point to any piece of evidence, no matter how weak in the context of the total administrative record, to support a denial of benefits. Though plan administrators

are entitled to a great deal of deference under an arbitrary and capricious standard, the Court is not required to become a rubber stamp; were that the case, there would be no point in having a court review the decisions of plan administrators. This leaves Dr. D'Auria's clarification letter, in combination with the HealthSouth FCE, as the only remaining avenue for finding the Committee's decision to be reasonable.

**3. Dr. D'Auria's Clarification in Response to Aetna's Inquiry**

In the IME conducted on January 30, 2001, Dr. D'Auria indicated that "[t]he only possibility of employability at this time is performing part-time (no more than 4–6 hours a day) sedentary work that does not involve any of the above mentioned activities that are recommended to be avoided. A sedentary position should be sought after." (A.R. at 167.) However, in an "Employability and Impairment Summary Form" that accompanied the IME report Dr. D'Auria stated that plaintiff was, "unable to return to his job or any gainful occupation." (*Id.* at 174.) Dr. Bonner, Aetna's Medical Director, noted the inconsistencies between Dr. D'Auria's two reports. In an attempt to resolve these substantial inconsistencies, Aetna sent Dr. D'Auria a questionnaire to clarify his findings. (*Id.* at 19, 251.) Dr. D'Auria was asked:

> 1) Do you believe Mr. Byrom's report that he drives farm equipment (a tractor), moves hay and feeds his cows on a regular basis? We have surveillance information that he does, in fact, perform these activities. *Doesn't this indicate that he retains some work capacity?*

8. Indeed, plaintiff's later performance in the tests administered by Dr. D'Auria perhaps confirms an inference that his performance in the tests administered by the physical therapist may have over-reflected his abilities. *See* discussion *supra* at 1171–72 (Dr. D'Auria found that plaintiff could not climb or bend, which was contrary to the observations of the physical therapist).

*Does this admission indicate a work capacity that is at least sedentary (partial hours) given that the reported activities are above sedentary PDC work[?]*

2) In your IME you indicate that Mr. Byrom could perform limited sedentary work and the FCE evaluation provides a functional capacities form that indicates a 4 to *8* hour work day (answer to item I.) However your final conclusion is that he can not work? Please clarify these conclusions.

3) Could Mr. Byrom perform limited work for a few hours a day, several days per week?

(*Id.* at 19.) (emphasis added)

In his response to the questionnaire, Dr. D'Auria, "apologize[d] for the inconvenience caused by some degree of lack of clarity on my part concerning my report." (*Id.* at 176.) Dr. D'Auria then indicated that plaintiff had volunteered the fact that he drives farm equipment. (*Id.* at 176.) Although Dr. D'Auria admitted not knowing the extent of plaintiff's farming activities, he concluded that "[t]his is definitely an indication that [plaintiff] does have some work capacity of, at least, sedentary work level and certainly in going over the results of the FCE, above the sedentary work PDC level." (*Id.*) Though the previously issued IME discussed only the "possibility" of a four to *six* hour work day, in his response to Aetna's inquiry, Dr. D'Auria expanded, without explanation, the duration of a potential work day for plaintiff, stating that "[a]ccording to the results of the FCE, [plaintiff] does have the capacity of performing a 4–*8* hour day of work and for some reason the wrong conclusion was issued regarding [plaintiff] not being able to work." [9] (*Id.*) Thus, in conclusion, with-

out any additional examination of plaintiff or explanation for the change, Dr. D'Auria requested that the records be corrected as follows: "**MR. JAMES BYROM IS ABLE TO WORK IN AN ABOVE SEDENTARY PDC WORK LEVEL.** He can work anywhere from 4–8 hours, several days a week over the course of a 4–5 day week. This is based on the results of the FCE." (*Id.* (emphasis in original).)

In ordering the change to his previous report, Dr. D'Auria did not offer any explanation of how, without any further examination of plaintiff, he had reconciled his earlier statements that plaintiff could "possibly" engage in a sedentary four to *six* hour work day with his earlier conclusion that plaintiff was unable to return to his job or any gainful occupation. As noted, the doctor also did not explain how he had reached his newest conclusion that plaintiff was capable of working four to *eight* hours.

Given the doctor's unexplained new conclusion and his earlier inconsistent conclusions, it is perhaps most useful to look at his factual findings, as opposed to his ultimate inconsistent conclusions about plaintiff's ability to work. As noted, Dr. D'Auria determined that plaintiff had extensive limitations due to his rheumatoid arthritis. He found that plaintiff could not perform any climbing, crawling, kneeling, lifting, pushing, or pulling. While plaintiff could occasionally reach above the shoulder to perform some forward reaching and some carrying, he could not bend or twist at the spine. While plaintiff's hand grasping was normal, he could not consistently grasp due to his arthritis and had to avoid firm hand grasping because the latter would overload the small joints of the hand that were susceptible to further damage.

---

**9.** Dr. D'Auria perhaps got his "eight hour" figure from defendant's inquiry, which incorrectly cited that number. Yet, that fact does little to reassure the Court that Dr. D'Auria's clarification represented his independent, professional assessment, as opposed to simply an affirmative response to a leading question by defendant.

Plaintiff could walk and sit, but he could not stoop at all and had to avoid frequent rotation of his neck. *Supra* at 1171–72. Moreover, though plaintiff was capable of sitting, even this activity was subject to significant interruptions, in that during a one hour and five minute period, plaintiff had to interrupt his sitting six times, at six to fourteen minute intervals, to stand. Likewise, while plaintiff could stand, during a twenty-one minute period, he had to sit twice due to back and leg pain. *Id.* at 1172. Indeed, in the part of his original report that concluded that plaintiff could not return to any gainful employment, Dr. D'Auria noted that plaintiff was "not capable of working at the sedentary PDC level as he is unable to lift 10 pounds through full range of motion. He has postural restrictions that include sitting and standing and require frequent interruption from both these postures." *Id.* at 1172. None of this sounds good to the Court. As to the ramifications of these impairments in the workplace, Dr. D'Auria's opinions were too inconsistent and unexplained to provide this Court, or the Committee, any clear picture of whether plaintiff could work or not.

To its credit, the Committee acknowledged the contradictions in Dr. D'Auria's statements. (*Id.* at 258.) In the end, however, the Committee came down on the side of Dr. D'Auria's very conclusory clarification,[10] and not his earlier report that had cited specific, significant impairments. Effectively, this means that the Committee chose to credit a physical therapist's FCE and an Aetna-selected doctor's conclusory and inconsistent statements over the opinions of plaintiff's treating physicians, an independent rheumatologist's IME, the Social Security disability award, Dr. D'Auria's initial IME and FCE, the majority of the surveillance conducted on plaintiff, and the statements of plaintiff's neighbors. Choosing to rely on this evidence and to totally discount the other evidence, including the medical opinions of four doctors, one of whom had been selected by Aetna, seems unreasonable to this Court. Moreover, the Court notes that an administrator's decision must be made in good faith. *Cagle,* 112 F.3d at 1518. That is, while great deference is paid to the administrator's ultimate decision, the assumption is that the administrator is acting as an impartial referee who begins his inquiry, like any judge, with an intention to arrive at a fair and correct determination. The arbitrary and capricious standard does not mean that an administrator is entitled to blind deference merely because, after receiving substantial and independent medical evidence that points to disability, the administrator has finally been able to find one or two pieces of evidence that could be used to pay lip service to a decision to deny disability benefits. A determination of reasonableness can occur only after a review of the entire record. On this record, the Court concludes that the administrator's decision to deny disability was not reasonable.[11]

10. "The results of the [HealthSouth] FCE combined with the surveillance and [plaintiff's] statements about [his] farm work overcame any problems with Dr. D'Auria's opinion in the minds of the Committee." (*Id.* at 258.)

11. Nor does *Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446 (11th Cir.1997), a case decided at the trial court level by this Court involving the same disability plan presently at issue, cause the Court to reach a different conclusion. There, the claimant, a Delta flight attendant, was involved in an incident that resulted in injury to her neck and shoulder. *Id.* at 1447. Unlike plaintiff's obviously debilitating rheumatoid arthritis, however, Paramore's own injury was far more benign and indeed Paramore's own treating physicians eventually reported that claimant was capable of performing sedentary work, as did a non-treating physician appointed by defendant.

Accordingly, the Court **DENIES** Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Airlines, Inc.'s Motion for Summary Judgment [16] and **GRANTS** Plaintiff's Motion for Summary Judgment [17].

## IV. *Remaining Miscellaneous Motions*

Both parties have filed several other motions in addition to their respective motions for summary judgment. The defendants first filed a motion for leave to file a reply to the plaintiff's response to their statement of undisputed material facts which was filed in conjunction with their motion for summary judgment. (*See* Defendants Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Air Line, Inc.'s Mot. for Leave to File Reply to Pl.'s Resp. to Statement of Undisputed Material Facts [25].) [12] Plaintiff then filed a motion for leave to file a sur-reply in opposition to the defendants' motion for summary judgment and in opposition to the defendants' reply to his response to their statement of undisputed material facts. (*See* Pl.'s Mot. for Leave to File Pl.'s Sur–Reply and Incorporated Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. and in Opp'n to Defs.' Reply to Pl.'s Resp. to Defs.' Statement of Undisputed Facts [31].) The defendants then responded with a brief of their own in opposition to the plaintiff's motion to file a sur-reply, as well as with a conditional motion for leave to file a response to plain-

tiff's sur-reply, should the Court accept that pleading. (*See* Defs.' Opp'n to Pl.'s Mot. for Leave to File Sur–Reply and to Defs.' Mot. for Summ. J. and Defs.' Reply to Pl.'s Resp. to Defs.' Statement of Undisputed Facts and Conditional Mot. for Leave to Reply [33].)

Neither the Federal Rules of Civil Procedure nor the local rules for the Northern District of Georgia authorize parties to file surreplies. Indeed, "to allow such surreplies as a regular practice would put the court in the position of refereeing an endless volley of briefs." *Garrison v. Northeast Georgia Med. Ctr., Inc.,* 66 F.Supp.2d 1336, 1340 (N.D.Ga.1999) (O'Kelley, J.). The parties to this case have proven Judge O'Kelley's prediction to be true. Each party filed two briefs in support of its motion for summary judgment, as well as a brief in opposition to the motion of the other side, for a total of six briefs addressing the issues before the Court. The parties then set about filing motions for leave to file the pleadings listed above, each shot from one side drawing a reply from the other. At this point, with the titles of both parties' motions growing longer by the day, it is now difficult to determine exactly to what pleading the parties are attempting to reply.

Moreover, all disagreements between the parties must be arbitrated by referring to the voluminous Administrative Record, which the Court has reviewed at great

---

*Id.* at 1447–48. This Court concluded, as did the Eleventh Circuit, that the defendant's decision to deny claimant's request for LTD benefits was not "unreasonable or inconsistent with the data with which the Committee had been provided." *Id.* at 1452. Obviously, the facts in this case are quite different from those in *Paramore.*

**12.** The defendants then filed Defendants Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Air Line, Inc.'s Motion for Leave to File Reply to

Plaintiff's Response to Statement of Undisputed Material Facts [30] on April 5, 2001. This motion is identical to the motion [25] filed on March 18, 2004, and the defendants withdrew the April 5 motion as inadvertently filed. (*See* Defs.' Mot. to Withdraw its April 5, 2004 Mot. for Leave to File Reply to Pl.'s Resp. to Statement of Undisputed Material Facts [32].) The Court therefore **GRANTS** the motion to withdraw [32] and **DENIES as moot** the withdrawn motion [30].

length. Thus, since the Court has gone directly to the source that the parties used, any omissions or mis-statements which may or may not appear in the parties' statements of the facts are largely irrelevant, making the parties' continuing round of briefing to attempt to correct these perceived errors unnecessary.

The Court therefore **DENIES** Defendants Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Air Line, Inc.'s Motion for Leave to File Reply to Plaintiff's Response to Statement of Undisputed Material Facts [25], **DENIES** Plaintiff's Motion for Leave to File Plaintiff's Sur–Reply and Incorporated Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Opposition to Defendants' Reply to Plaintiff's Response to Defendants' Statement of Undisputed Facts [31], and **DENIES** Defendants' Conditional Motion for Leave to Reply [33].

### V. *Form of the Judgment*

The Court is prepared to enter judgment for the plaintiff, but needs some assistance from the parties as to the relief that should be included in any judgment. With regard to retroactive benefits, plaintiff has requested retroactive benefits from July 1, 2000. The Court's review of the record, however, indicates that plaintiff's benefits were not terminated until March 6, 2001. (A.R. at 252.) The Court therefore assumes that plaintiff will be entitled to long term disability benefits retroactive only to March 6, 2001. The Court also anticipates some award of prejudgment interest and reinstatement of other employee benefits lost as a result of the Committee's decision to deny plaintiff's appeal for benefits. Further, the Court understands that plaintiff's retroactive and ongoing disability benefits are, per the terms of the

Plan, to be offset by the amount of plaintiff's Social Security benefits.

Given the Court's uncertainty as to the proper wording of a judgment, it will allow both sides **twenty (20) days** from issuance of this order to propose joint language for a judgment. The parties should address the above matters. To the extent that there is a difference of opinion on the language, the parties should submit memoranda outlining those differences and the basis for each party's position.

Plaintiff has also requested attorney's fees. Plaintiff should file a separate motion on the question of attorney's fees, and defendant will be permitted to respond. It is the Court's experience that the seeking of attorney's fees by a prevailing plaintiff is often an uphill battle, given the ERISA statute's provisions regarding such fees. In any event, a colorable request by an ERISA plaintiff for attorney's fees usually triggers a substantial amount of briefing; given the press of the Court's other work, resolution by the Court is usually not quick. The Court would like to issue a judgment as expeditiously as possible so that the plaintiff, who has been deprived of his disability benefits for three and a half years, can begin receiving them as soon as is practicable. Accordingly, the Court does not wish any dispute over attorney's fees to delay the issuance of a judgment.

In addition, the Court is aware that plaintiff has been unemployed for quite a while and does not wish for him to incur further attorney's fees in pursuing attorney's fees, until such time as it is clear either that defendant is not appealing this decision or that the Eleventh Circuit has affirmed it. Otherwise, plaintiff and defendant would incur unnecessary expenses. Accordingly, the Court would like for the parties to arrive at a vehicle whereby plaintiff can preserve its right to request attorney's fees, but where neither plaintiff

nor defendant will have to incur attorney's fees until it becomes clear that this Court's Order will stand.[13] For that reason, absent some meritorious objection, the Court intends to issue a judgment, after which it will resolve the question of attorney's fees, assuming that the parties cannot agree on this matter.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Airlines, Inc.'s Motion for Summary Judgment [16]; **GRANTS** Plaintiff's Motion for Summary Judgment [17]; **DENIES** Defendants Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Air Line, Inc.'s Motion for Leave to File Reply to Plaintiff's Response to Statement of Undisputed Material Facts [25]; **GRANTS** Plaintiff's Motion for Leave to File Reply Brief in Excess of Page Limitation [27]; **DENIES as moot** Defendants Delta Family–Care Disability and Survivorship Plan and Administrative Committee of Delta Air Lines, Inc.'s Motion for Leave to File Reply to Plaintiff's Response to Statement of Undisputed Material Facts [30]; **DENIES** Plaintiff's Motion for Leave to File Plaintiff's Sur–Reply and Incorporated Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Opposition to Defendants' Reply to Plaintiff's Response to Defendants' Statement of Undisputed Facts [31]; **GRANTS** Defendants' Motion to Withdraw its April 5, 2004 Motion for Leave to File Reply to Plaintiff's Response to Statement of Undisputed Material Facts [32]; and **DE-**

**NIES** Defendants' Conditional Motion for Leave to Reply [33].

---

13. Sometimes in civil cases before this Court in the past, the plaintiff has moved for attorney's fees and, where there has been an appeal, the Court has denied that motion without prejudice to plaintiff refiling it upon the issuance of a mandate from the Eleventh Circuit. Assuming that this procedure is agreeable to the parties and that plaintiff does not otherwise lose any ability to seek attorney's fees, this procedure would be acceptable to the Court.