[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 4, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-14352

_____

D. C. Docket No. 05-80183-CV-PAS

BOCA RATON COMMUNITY HOSPITAL, INC.,
a Florida not-for-profit corporation d.b.a.
Boca Raton Community Hospital, Inc.,

Plaintiff-Appellant,

OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF
LEGAL AFFAIRS,

Plaintiff,

versus

TENET HEALTH CARE CORPORATION,
a Nevada corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 4, 2009)

Before DUBINA, Chief Judge, CARNES, Circuit Judge, and RESTANI,[*] Judge.

CARNES, Circuit Judge:

More than a hundred years ago the mother of modern nursing, Florence Nightingale, observed: "It may be a strange principle to enunciate as the very first requirement in a Hospital that it should do the sick no harm. It is quite necessary, nevertheless, to lay down such a principle . . . ."[1] When Nightingale wrote those words hospitals were not the sanitary sanctuaries they have become, and the harm she meant to shield her patients from was new or worsening illness. Since then the health care situation has become more complicated. Some hospitals are part of profit-driven, multi-billion dollar corporations, and the harm they can do has taken on additional forms. One such corporation is Tenet Health Care, and this case is about the economic harm it did by manipulating part of the Medicare program.

## I.

Boca Raton Community Hospital, Inc. is the largest hospital in southern Palm Beach County, Florida. Tenet Health Care Corporation is the second-largest for-profit hospital chain in the country, with more than seventy-five acute care

---

[*] Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

[1] Florence Nightingale, Notes on Hospitals, at iii (London, Longman, Green, Longman, Roberts & Green 3d ed. 1863).

facilities in thirteen states including Florida. Both Boca and Tenet participate in Medicare, a government health insurance system for the aged and disabled that is administered by the Center for Medicare and Medicaid Services (the Center).

Medicare reimburses participating hospitals for treatments given to qualified patients during acute care inpatient hospital stays. Instead of paying whatever the treatment actually costs, however, Medicare pays the hospital a fixed amount based on the patient's diagnosis. Medicare recognized that some treatments would cost significantly more than the standard fixed rate, so it created an "outlier program" to supplement the fixed-rate payment in those cases. Under the outlier program, a hospital receives additional reimbursements when the cost it incurs to treat a patient is greater than the standard fixed-rate payment by a specified amount called the fixed loss threshold. The loss threshold acts like an insurance deductible because the hospital is responsible for that portion of the treatment's excessive cost and then Medicare disburses an outlier payment for the amount exceeding the loss threshold.

The Center sets the loss threshold annually using a method that estimates the level that will keep total outlier payments between five and six percent of total inpatient Medicare reimbursements. The Center can consider a variety of factors when setting the loss threshold, including policy concerns, public comment, and

3

expectations about inflation and the rate of change for hospital spending and charges. Because the Center does not disclose which of those factors it uses or how it uses them in any given year, we do not know the exact formula that produces the loss threshold. Boca describes the loss-threshold-setting process as an "iterative" one in which the Center begins with a "best guess" about what loss threshold will meet its target percentage.[2] According to Boca, after estimating the next year's number of outlier claims based on historical data, the Center then uses trial and error until its best guess actually predicts total outlier payments equal to the target.

The outlier program is designed to reimburse hospitals for extraordinary costs, but during the years involved in this appeal the Center calculated outlier payments using a hospital's charges. To approximate a hospital's costs, the Center multiplied the hospital's charges by its "audited" cost-to-charge ratio, a hospital-specific number the Center reaches by reviewing a hospital's most recent settled cost reports.[3] Because it takes between two and five years to audit cost reports, the audited ratios the Center used to calculate outlier payments were

_____

[2] The total outlier payment target for 2000 through 2004 was 5.1 percent. The Center actually paid out between 6.1 and 7.6 percent during those years.

[3] The equation used by the Center to approximate costs when determining outlier payments can be represented this way: APPROXIMATE COSTS = CHARGES × RATIO.

4

outdated and did not necessarily reflect a hospital's actual current charges or costs. Although a more current, "unaudited" ratio could be determined using a hospital's more recent (though tentative) cost reports, the Center used the time-lagged, audited ratios. So an increase in billed charges without a corresponding increase in costs made costs appear to have gone up even when they had not. As a result, hospitals with constant costs could receive more outlier payments simply by increasing charges.

At the end of each fiscal year, the Center calculated a national average of all hospitals' audited ratios. Using the national average the Center then created a National Threshold ratio range with its high and low points three standard deviations above and below the average. The Center assumed any audited ratios that fell outside this range were "unreasonable, in that [they] [we]re probably due to faulty data reporting or entry, and should not be used to identify and pay for cost outliers." To correct this perceived faulty data when calculating outlier payments, the Center substituted a statewide average ratio for any audited ratio that fell outside the range. If a hospital's audited ratio fell below the low National Threshold and the average ratio was substituted, that hospital would receive higher outlier payments than it would have if its own audited ratio had been used.

In August 2003 the Center changed the outlier payment system in three ways: (1) it allowed outlier payments to be calculated using unaudited ratios to approximate actual costs more accurately by recognizing recent charge increases; (2) it stopped substituting average ratios for ratios below the low National Threshold so that hospitals received outlier payments based on their "actual" ratios no matter how low those ratios fell; and (3) it made outlier payments subject to recapture on a case-by-case basis to ensure that the finalized outlier payments reflected an accurate assessment of the actual costs hospitals incurred. These changes were prospective only.

Boca believed that in the period before the 2003 changes, Tenet had been gaming the outlier program to get more reimbursements than its extraordinary-cost cases justified. Boca filed a class action complaint to that effect in March 2005 and amended it to include a revised class definition in June 2006. In the amended complaint, Boca alleged that Tenet increased its outlier reimbursements by dramatically raising its charges without reference to any actual cost increases, making average-cost cases look like outlier cases. Boca asserted that Tenet maximized its outlier receipts by taking advantage of both the Center's use of outdated audited ratios that did not reflect price increases and the Center's substitution of average ratios for audited ratios below the low National Threshold.

6

Boca claimed that because Tenet's charge increases were unrelated to real cost increases, the excessive outlier payments it received from those inflated charges were unlawful and constituted a RICO violation under 18 U.S.C. § 1962(c), (d). As RICO predicate acts, Boca alleged that Tenet transported or received the "stolen or converted" outlier funds in violation of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

Boca originally sought to represent a class of "all acute-care hospitals in the United States" that would have been eligible for outlier reimbursements between 2000 and 2004, or would have received higher reimbursements, but for Tenet's conduct. Boca later narrowed its class definition to include only acute-care hospitals that received at least one outlier payment between 2000 and 2004, had an unaudited ratio above the low National Threshold, and were not owned by Tenet or a Florida governmental entity. Boca also added a component to its liability theory by re-defining Tenet's wrongful conduct, which it called "turbocharging," as the "breaking [of] any rational or reasonable relationship between charges and costs by driving hospital [audited ratios] below the low National Threshold." So for both class certification and liability, Boca used the low National Threshold to divide potential-class-member victim hospitals (those with audited ratios above

7

the low National Threshold) from non-class-member culpable hospitals (those with audited ratios below the low National Threshold).

In describing its injury Boca claimed that Tenet's turbocharging, and the excessive outlier payments Tenet received as a result of it, forced the Center to increase the loss threshold to keep total outlier payments at the target percentage. That increase of the loss threshold caused Boca to receive less outlier money for its legitimate extraordinary-cost cases than it would have but for Tenet's turbocharging. To prove its injury and resultant money damages, Boca offered an expert opinion. The opinion purported to show that Tenet's overcharging had caused the loss threshold to increase, that Boca would have received additional outlier payments but for Tenet's overcharging, and the amount of those additional outlier payments. Boca's experts created a "Tenet-adjusted" loss threshold—the loss threshold that the Center would have set if it had not had to pay out Tenet's unlawful outlier claims. They arrived at that loss threshold number by replacing the audited ratios the Center used to calculate Tenet's outlier payments with unaudited ratios that allowed for a closer approximation of Tenet's costs. The experts then compared the amount of outlier payments Boca would have received using their Tenet-adjusted loss threshold with the payments Boca actually did

receive. The difference in those amounts was, in their opinion, the injury Tenet's conduct had inflicted on Boca.

In December 2006 the district court denied Boca's motion for class certification. Eight months later in August 2007, the district court granted summary judgment to Tenet after finding that its overcharging was not the proximate cause of any loss in outlier payments Boca suffered. To reach that conclusion the court considered the "motivating factors" behind the proximate cause requirement described in <u>Anza v. Ideal Steel Supply Corp.</u>, 547 U.S. 451, 126 S. Ct. 1991 (2006). The court found that the first <u>Anza</u> factor, whether the connection between the conduct and the injury was too attenuated because other things could have contributed to the injury, cut against Boca. The court noted that some of Tenet's charge increases could have been lawful and that the Center's exact reason for raising the loss threshold was not known. Many hospitals had dramatically raised charges between 2000 and 2004, so Tenet's overcharging was not the only reason the loss threshold went up even if it did play a role.

The second and third <u>Anza</u> factors—whether damages would be difficult to ascertain and whether a more direct victim could better vindicate the underlying violation of the law—also cut against Boca. The court found that Boca's injury and damage opinions were flawed because they were not based on the amount of

9

Tenet's overcharges. Because the government had filed its own suit against Tenet based on the same overcharging "theft" that Boca alleged and had received a $900 million settlement, of which $800 million was recaptured outlier payments, the court found that the most direct victim of Tenet's misbehavior had already vindicated the underlying violation of the law.

In the same August 2007 order, the district court granted Tenet's motion to strike Boca's expert opinion on injury and damages. The experts' methodology did not fit Boca's liability theory, according to the court, so their opinion did not meet the requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993). The court noted that although Boca's liability theory rested on overcharging, the injury and damages calculations merely substituted unaudited ratios for the audited ratios that the Center had used to determine Tenet's outlier payments. The experts made no attempt to figure out what Tenet could have lawfully charged, so they did not know how much Tenet had overcharged. As a result, the experts could not tell how Tenet's overcharging had impacted the loss threshold. Because outlier payments were based on charges rather than costs, the court found that the experts' decision to manipulate costs instead of charges made their method unhelpful and thus inadmissible.

10

Boca appeals the district court's denial of class certification, grant of summary judgment, and exclusion of its expert opinion.

## II.

We turn first to the district court's exclusion of Boca's expert opinion on injury and damages. We review a district court's exclusion of expert testimony only for abuse of discretion, Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141-43, 118 S. Ct. 512, 517 (1997), which "requires that we defer to the district court's ruling unless it is manifestly erroneous." Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005) (internal quotation marks omitted). Because evaluating the reliability of expert testimony is uniquely entrusted to the district court under Daubert, we give the court "considerable leeway" in the execution of that duty. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999); see also McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002).

The party offering the expert testimony has the burden of demonstrating that the testimony is "relevant to the task at hand" and "logically advances a material aspect" of its case. See Daubert, 509 U.S. at 597, 113 S. Ct. at 2799; Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999) (internal quotation marks omitted). The "basic standard of relevance . . . is a liberal one," Daubert,

11

509 U.S. at 587, 113 S. Ct. at 2794, but if an expert opinion does not have a "valid scientific connection to the pertinent inquiry" it should be excluded because there is no "fit." See id. at 591–92, 113 S. Ct. at 2796; McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004). The offering party must show that the opinion meets the Daubert criteria, including reliable methodology and helpfulness to the factfinder in understanding the evidence or determining a fact, by a preponderance of the evidence. See Rink, 400 F.3d at 1292.

The district court found Boca's method inadequate and speculative because it did not attempt to show what amount of Tenet's charges were unlawful. Instead it focused on approximating Tenet's actual costs more closely. To do this, Boca's method swapped the outdated audited ratios (or the artificially high average ratios) the Center used to determine Tenet's outlier payments for the more current and accurate unaudited ratios. The court recognized that Boca's method mirrored the changes the Center implemented in its 2003 regulation amendments, which were meant to close one of the loopholes opportunistic hospitals (like Tenet) had been using to game the outlier program. But the court also noted that because Boca's liability theory was based on the idea that Tenet's unlawful overcharges caused the Center to raise the loss threshold, Boca's injury and damages had to flow from whatever effect those unlawful overcharges actually had on the loss threshold.

12

Without knowing the amount of unlawful overcharges, the court concluded, Boca's experts could never know the effect, if any, those charges had on the loss threshold. And without knowing that effect, the experts could not show that Boca had suffered an injury, much less the extent of it.

Boca contends that the district court misunderstood the outlier program in general and its expert opinions' methodology in particular. It argues that, whether charges are reasonable or unreasonable, the Center's cost-approximation equation will generate the same number as long as the ratio used is accurate. Because the Center pays outliers based on costs and not on charges, Boca argues, there is no need to determine the amount of Tenet's overcharging to see how it affected the loss threshold. By replacing the "manipulated" audited ratios Tenet used to obtain "fraudulent outliers" with "accurate" unaudited ratios, Boca asserts that its expert opinion "isolates and removes Tenet's excess outliers, provides a reasonable measure of Tenet's appropriate outliers based on its actual costs, and in turn establishes the basis for determining the effect of Tenet's scheme" on the loss threshold. Tenet maintains that Boca's expert opinion does not fit its liability theory and would therefore "confuse and mislead the jury by impermissibly purporting to measure Tenet's impact" on the loss threshold.

13

The district court's conclusion that Boca's expert opinion on injury and damages did not fit its liability theory was not manifestly erroneous because, like an oversized coat, the expert opinion covered too much. Under Boca's liability theory, it is not unlawful for hospitals to overcharge (that is, to increase charges out of step with costs) as long as their audited ratios do not fall below the low National Threshold. Because Boca's expert opinion uses unaudited ratios to approximate Tenet's actual costs, it includes the outlier payments Tenet got from lawful overcharging, as well as unlawful overcharging, as part of Boca's injury and damages. In that way Boca's expert opinion holds Tenet to a stricter standard for injury and damages than its liability theory does for culpability by including charges that were excessive but not so much so that they forced a hospital's audited ratio below the low National Threshold. In other words, Tenet could have overcharged somewhat less than it did without being culpable under Boca's liability theory, but Boca's injury and damages theory would still hold Tenet accountable for even those portions of its overcharging that were not unlawful according to the liability theory.

Boca drew a line between lawful and unlawful behavior for liability purposes: the low National Threshold. Boca could have walked that line in a way that fit its theory of injury and damages to its liability theory; it could have chosen

14

a method that showed that the behavior Boca claims caused its injuries, Tenet's unlawful overcharging, actually impacted the loss threshold. All that Boca's expert opinion purported to show, however, was the amount of most clearly lawful outlier payments Tenet could have gotten—the amount of outlier money Tenet would have received if it had used its actual costs to apply for the payments. What Boca's expert opinion fails to recognize (which, by contrast, its liability theory does) is the range of behavior between clearly unlawful and perfectly lawful.

Having tailored a trim-fitting liability theory for the body of its case against Tenet, Boca cannot hang a baggy injury and damages theory on it. Whatever expert opinion Boca provided had to be suitably proportioned. And because Boca's injury and damages opinion was not confined to charges that its liability theory would consider unlawful, it was too broad. It was ill-fitting. Thus the district court did not abuse its discretion by excluding Boca's expert opinion on injury and damages for lack of fit with its liability theory.

## III.

Our conclusion that the district court did not abuse its discretion in excluding Boca's expert opinion on injury and damages compels a second one: that the district court's grant of summary judgment in favor of Tenet was appropriate. Without its expert opinion, Boca has not offered any evidence of

15

injury—an essential element of its RICO claim.  See 18 U.S.C. §§ 1962(c),

1964(c) (authorizing "[a]ny person injured in his business or property" by an

unlawful pattern of racketeering to "recover threefold the damages he sustains");

McCaleb v. A.O. Smith Corp., 200 F.3d 747, 752 (11th Cir. 2000) ("There is no

liability if a RICO violator has not caused injury."); Beck v. Prupis, 162 F.3d

1090, 1095 (11th Cir. 1998) ("[A] civil RICO plaintiff must show that the

racketeering activity caused him to suffer an injury.").  Thus we do not need to

address the second reason the district court gave for granting summary judgment,

that Tenet was not the proximate cause of Boca's injury.[4]

The district court made a point to emphasize, as we do now, that while

summary judgment for Tenet was appropriate, Tenet was not blameless.  The

record shows that Tenet hospitals took advantage of a system designed to help pay

for the sickest and least fortunate patients to heal.  The people hurt the most by

Tenet's manipulation of the Medicare outlier program through excessive charge

increases are the uninsured, who are forced to pay hospitals' "sticker prices"

instead of the reduced rates insurance companies negotiate for their clients.  This

---

[4] Because summary judgment was appropriate, Boca's challenge to the district court's denial of class certification is moot.  See Rink, 400 F.3d at 1297 ("Because we have found that summary judgment was properly granted as to the underlying claims of the class representatives, the issue of class certification is moot.").

16

may not be what Florence Nightingale had in mind when she warned about the harm hospitals could do, but it is still a harm against which patients deserve protection. The government has addressed this new strain of harm by recovering almost a billion dollars from Tenet and making changes to the way the outlier program runs. Hopefully those actions will help prevent similar abuse in the future and serve to remind hospitals that their first duty is to do no harm to anyone.

    **AFFIRMED.**