Kent **GILLILAND, for himself individually and on behalf of a class of all others who are similarly situated,** Plaintiff,

v.

**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, et al.,** Defendants.

Civil Action No. 1:07–cv–3082–TCB.

United States District Court, N.D. Georgia, Atlanta Division.

Oct. 15, 2009.

---

J. Tobias Dykes, Constangy Brooks & Smith–Al, James N. Nolan, Walston Wells

Anderson & Bains, John Q. Somerville, Galloway & Somerville LLC, Birmingham, AL, for Plaintiff.

David M. Semanchik, Air Line Pilots Association, Herndon, VA, James Michael Walls, Atlanta, GA, Robert Moore Weaver, Nakamura, Quinn, Walls, Weaver & Davies, LLP, Birmingham, AL, Tessa Addie–Lee Warren, Nakamura, Quinn & Walls, Weaver & Davies, LLP, Decatur, GA, Peter Herman, Travis M. Mastroddi, Cohen Weiss & Simon, New York, NY, for Defendants.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

This is a putative class action in which Plaintiff Kent Gilliland alleges that Defendants discriminated against him and other Delta Air Lines pilots on long-term disability ("LTD") leave with respect to the allocation of a $2.1 billion unsecured claim that was granted by Delta during its bankruptcy proceeding.

The case is now before the Court on Gilliland's second motion for class certification [74], Defendants' motion for summary judgment [82], Defendants' motion for leave to file excess pages [111], and Gilliland's motion to strike additional materials that Defendants filed in support of their motion for summary judgment [117].

### I. Facts

#### A. Background

Defendant Air Line Pilots Association, International ("ALPA") is the exclusive collective bargaining representative for airline pilots who are employed by Delta Air Lines, Inc.[1]

---

1. Gilliland also names as Defendants the ALPA Delta Master Executive Council ("Delta MEC") as well as individuals Donald Lee Moak, Timothy G. Canoll, Kingsley Roberts, Jim White, Kenneth C. Rogers, and Michael Greer, who are all present or former ALPA representatives and MEC members.

In the wake of the catastrophic downturn in the airline industry following the tragic events of September 11, 2001, ALPA entered into a collective bargaining agreement with Delta—titled Letter of Agreement 46 ("LOA 46")—that provided the airline with massive concessions, including a 32.5 percent wage cut. The parties had hoped that LOA 46 would help Delta avert bankruptcy. However, Delta's financial situation continued to deteriorate, and in September 2005 the company filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.

Early in the bankruptcy proceedings, pursuant to 11 U.S.C. § 1113, Delta moved to reject the pilots' collective bargaining agreement. In settlement of Delta's motion, Delta and ALPA entered into a modified collective bargaining agreement, titled Letter of Agreement 51 ("LOA 51").

LOA 51 became effective on June 1, 2006, had a forty-three-month duration, and contained further concessions to Delta in the form of wage cuts and reductions in other terms and conditions of employment. In exchange for these and other concessions, Delta agreed to provide ALPA with a $2.1 billion unsecured claim in the Delta bankruptcy. To satisfy the claim, Delta planned to issue equity securities when Delta successfully reorganized.

LOA 51 conferred upon the Delta MEC, ALPA's coordinating council for Delta pilots, the authority to determine a "reasonable and lawful" manner of allocating the claim among the Delta pilots. The MEC appointed a committee known as the Allocation and Distribution Committee ("ADC"), which was comprised of Delta pilots, and charged the committee with (1) developing methods to appropriately allocate the claim; (2) recommending such methods to the MEC; and (3) overseeing the distribution of the claim proceeds in accordance with the direction of the MEC.

The ADC devoted considerable time to exploring various allocation models, and it attended several meetings held by the MEC to receive directions from and make recommendations to the MEC. On October 6, 2006, the MEC unanimously adopted a claim allocation model.

Three days later, on October 9, 2006, ALPA informed Delta pilots of the details of the model in a communication entitled "ADC Dispatch 06–03." Later that month, ADC members met with Delta management to present a description of the model in light of the contractual requirement that it be reasonable and lawful. Delta did not object to the model.

In May and June 2007, shortly after Delta's exit from bankruptcy, Delta distributed the claim proceeds to the pilots in accordance with the model.

The gravamen of Plaintiff's complaint is that the model allocated the claim in a manner that discriminated against pilots who were on LTD leave.

### B. The Model

As both parties have recognized in their summary judgment briefs, the model is complex, and it contains many nuances that attempt to address the unique situation of certain pilots. Due to the manner in which the Court hereafter disposes of the legal issues raised in this action, a full explanation of all of the details surrounding the model is unnecessary. With this in mind, the Court will describe the essence of the model.

In developing the model, the MEC took into account that the major portion of the concessions resulting from LOA 51 would be borne by pilots who would be actively flying for Delta under the terms and conditions of LOA 51. As a result, the model provided a full allocation of the claim to pilots who were expected to fly during the

forty-three-month projected term of LOA 51.

At the same time, the MEC knew that certain pilots for varying reasons would not be flying for significant portions of LOA 51's term. These pilots included those slated for mandatory retirement under federal law, pilots on personal leave, layoff ("furlough"), "bypass" (pilots who had turned down offers of recall from furlough), and pilots on LTD leave. Under the model, these pilots received a reduced allocation of the claim as compared with pilots who were expected to fly during the term of LOA 51.

The model divided the $2.1 billion claim into the following four equal silos of $525 million: (1) per capita; (2) system seniority (i.e., a pilot's position on the Delta pilots' system seniority list); (3) years of service (i.e., a pilot's longevity with Delta); and (4) hourly rate.[2] Allocations from each silo were then calculated independently of each other and for each month of LOA 51's forty-three-month duration and then added together to yield a pilot's total allocation.

Approximately 6,100 Delta pilots—the vast majority of the nearly 6,800 on the June 1, 2006 seniority list—were actively working on the two snapshot dates that the model used. Those 6,100 pilots were projected to continue actively working throughout the duration of LOA 51. Thus, with few exceptions not relevant here, these 6,100 pilots received an allocation from all four silos, i.e., a full allocation.

As explained above, pilots who did not or would not actively work through the entire duration of LOA 51 did not receive an allocation from all four silos. The model defined 701 such pilots as "special case pilots" as of November 1, 2006:(1) 84 on personal leave; (2) 232 furloughed; (3) 149 on bypass; and (4) 236 on LTD leave.

The MEC expected that some special case pilots would return to work during LOA 51's term, but it could not know who or when. Therefore, to provide these inactive pilots with a partial allocation, the model allocated to them claim dollars from three of the four silos, excluding the hourly rate silo. The logic of this approach was that pilots in these categories did not have and were not compensated based upon hourly rates established in LOA 51, but they did have seniority numbers and dates of hire. Additionally, this approach took into account the model's projection that each of these pilots might return to active status by bankruptcy exit and thus work under LOA 51 for approximately three-quarters of its forty-three-month duration.

The 247 pilots who were either on personal leaves of absence (42 pilots) or bypass (205 pilots) at bankruptcy exit received distributions from only the seniority silo because they had chosen to be inactive but still might work during LOA 51's duration.

Pilots like Gilliland, who had not returned from LTD by bankruptcy exit, received distributions from two silos (seniority and years of service). These pilots received distributions from more silos than the bypass and the pilots on personal leaves of absence because the LTD pilots were considered to be involuntarily inactive. However, these LTD pilots received one fewer silo than initially allocated because they had not returned to work. For pilots like Gilliland with significant seniority and longevity, the initially allocated per capita silo was the smallest of the three, leaving Gilliland and others like him with

---

**2.** The hourly rate metric applied the LOA 51 contractual pay rate for the type of aircraft a pilot flew and the seat a pilot held on the aircraft as of October 1, 2006, as well as then known future rate changes, such as LOA 51's scheduled contractual rate pay increases and previously awarded changes in aircraft and seat assignments.

more than two-thirds of their initial claim allocation.

### C. *The LTD Plan*

In addition to the claim allocation, eligible pilots such as Gilliland were provided benefits under a LTD plan, a plan that is a collectively bargained employee welfare plan specific to Delta's pilots and incorporated into the collective bargaining agreement.

To qualify for LTD benefits, a Delta pilot must be ineligible "to exercise the privileges of his First Class [Airman] Medical Certificate," or determined by Delta not to "meet the standards established by the [Federal Aviation Administration] for the issuance of a First Class [Airman] Medical Certificate." Under federal regulations, a First Class Airman Medical Certificate is a mandatory requirement to fly a commercial airplane. *See* 14 C.F.R. §§ 61.3(c) & 61.23(a)(1).

The LTD plan provides for a monthly LTD benefit calculated in two components, one variable and one fixed. The variable component of a pilot's monthly LTD benefit is calculated based upon the investment performance of the disability plan assets. The fixed component of a pilot's monthly LTD benefit, which operates as a floor to the total benefit, is calculated as 50 percent of the lesser of the pilot's earnings or composite hourly rate. Because the calculations of earnings and composite hourly rate under the disability plan are based on factors existing as of a qualified pilot's event date, Gilliland's monthly LTD benefit remained unaffected by the terms of LOA 51.

To enhance the disability plan's financial viability, and therefore protect LTD benefits, ALPA and Delta agreed in LOA 51 to the following changes to the voluntary employee beneficiary association ("VEBA"), a trust that holds disability plan assets from which disability plan benefits are paid: (1) for the first time, VEBA would exist solely for the benefit of Delta's pilots to the exclusion of any other employee groups; (2) Delta would specifically fund the pilot's VEBA; and (3) Delta would pay disability plan benefits in the event that VEBA was not sufficiently funded.

However, the benefits afforded to pilots under the LTD plan were also reduced in an important way. Prior to LOA 51, the LTD plan provided for a lifetime monthly benefit to a pilot who qualified for LTD before retirement. As the parties anticipated while negotiating LOA 51, Delta and ALPA agreed to cease continued LTD benefits upon a pilot's reaching the federal mandatory retirement age for commercial airline pilots (sixty-five). In recognition of the cessation of lifetime LTD benefits, ALPA secured Delta's agreement in LOA 51 to make contributions to pilot-defined contribution retirement plans on behalf of non-retired LTD pilots (including Gilliland).

In negotiating LOA 51, Delta sought to amend the disability plan's eligibility provision so that its eligibility criteria would be the same as those for Social Security Disability benefits, which would cause far fewer pilots to qualify for LTD benefits. ALPA successfully resisted this Delta proposal, and LOA 51 did not alter the LTD plan's eligibility criteria.

### D. *Plaintiff Gilliland*

Plaintiff Kent Gilliland began working for Delta as a pilot in 1986. He has not flown for Delta since September 12, 2005, because he can no longer hold the First Class Airman Medical Certificate required for commercial pilots. He has been diagnosed with Idiopathic Hypersomnia with symptoms of Narcolepsy, Dysautonomia with Neurocardiogenic Syncope, and Obstructive Sleep Apnea. Since April 1, 2006, he has been on LTD leave and has re-

ceived monthly benefits. He currently attends law school.

In accordance with the claim model, Gilliland's initial estimated allocation in claim dollars was $278,773.16 ($107,959.24 in the years of service silo, $95,616.35 in the seniority silo, and $75,197–57 in the per capita silo). Because he did not return to work by April 30, 2007, the date upon which Delta exited from bankruptcy, he received distributions from two silos (seniority and years of service) with a total value of $214,705.51 in claim dollars and $128,650.74 in actual dollars.[3]

Gilliland contends that the claim allocation model unlawfully discriminated against him based upon his disability.[4] In addition to relying upon the way the model was constructed, Gilliland also cites several stray remarks made by various union officials that he contends further proves Defendants' discriminatory animus toward LTD pilots.[5]

Gilliland's complaint asserts three claims: (1) the model discriminates against him in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq.; (2) Defendants breached the duty of fair representation ("DFR") that they owed Gilliland; and (3) Defendants' conduct violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.

Defendants have moved for summary judgment on all of Gilliland's claims.[6]

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir.1991). The nonmovant is

3. The actual dollar amount was less than the initial claim dollar amount because the actual dollar value of any portion of the ALPA claim could not be known until either that portion was sold or until Delta exited bankruptcy and issued equity to settle the claim (at which time the market would determine the equity value). Therefore, when describing the value of the ALPA claim or any portion of this claim, the MEC referred to the initial allocation in terms of "claim dollars," which corresponded to the $2.1 billion nominal value of the claim and not the actual dollar value to be realized.

4. As noted, Gilliland seeks to bring this case as a class action on behalf of all LTD pilots whose distributions were diminished by the model. Specifically, Gilliland seeks to represent a class that he defines in his amended motion for class certification as:

All Delta Air Line pilots throughout the United States (including Puerto Rico and the U.S. territories) who were on disability at any time from June of 2006 until May of 2007 and who received diminished or no distributions with respect to the $2.1 billion claim that was recognized in the Delta Air Lines Bankruptcy Proceeding.

5. In light of the Court's disposition of the legal issues in this case, there is no need to catalogue or analyze the legal significance of these remarks.

6. Defendants filed a motion seeking leave to file excess pages in connection with their reply brief in support of their motion for summary judgment [111]. Because the Court granted page limitation extensions to both parties in their opening briefs, a longer reply brief was warranted. The Court therefore grants Defendants' motion for leave to file excess pages.

then required to "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions, and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the Court must determine "whether a fair-minded jury could return a verdict for the plaintiff upon the evidence presented." *Id.* If reasonable minds could differ as to the conclusion drawn from the evidence in the record, the motion for summary judgment should be denied. *Id.* at 251, 106 S.Ct. 2505.

### B. *Analysis*

#### 1. *Gilliland's ADA Claim* [7]

To establish a prima facie case under the ADA, Gilliland must show that he (1) has a disability; (2) is a qualified individual; and (3) was discriminated against because of his disability. *Witter v. Delta Air Lines, Inc.,* 138 F.3d 1366, 1369 (11th Cir. 1998).

Defendants assert that Gilliland is not a qualified individual within the meaning of the ADA. Under the ADA, a qualified individual is a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1258 (11th Cir.2001). The Eleventh Circuit has repeatedly held that individuals who are

"unable to perform the essential functions of their jobs" cannot state an ADA claim. *Cramer v. Florida,* 117 F.3d 1258, 1264 (11th Cir.1997).

█ As noted above, Gilliland lacks a First Class Airman Medical Certificate, which indisputably disqualifies him from working as a commercial airline pilot. *See* 14 C.F.R. §§ 61.3(c) & 61.23(a)(1). He also admits that there is no reasonable accommodation that ALPA or Delta could provide him that would enable him to regain his certification. According to Defendants, Gilliland's admissions in this regard foreclose his ability to pursue an ADA claim and compel the entry of summary judgment in their favor on this claim. *Accord Terry v. Am., Airlines, Inc.,* No. 02–C–8829, 2004 WL 2211606, at *13 (N.D.Ill. Sept. 30, 2004) (absent a First Class Medical Certificate, plaintiff was "not qualified to perform the job of pilot," thereby precluding his ADA claim).

Gilliland counters that the Second and Third Circuit Courts of Appeals have each held that a plaintiff can state an ADA claim against an employer in situations involving allegedly discriminatory employment-related fringe benefits without meeting the "qualified individual" requirement. *See Ford v. Schering–Plough Corp.,* 145 F.3d 601, 605–06 (3d Cir.1998) (former employee who could no longer perform functions of position due to mental disorder could bring action against employer and insurance carrier alleging that disparity in disability benefits for mental disabilities violated the ADA); *Castellano v. City of New York,* 142 F.3d 58, 66 (2d Cir.1998) (former employees could challenge alleged discrimination in provision of variable supplement funds benefits even though they

---

**7.** Although Gilliland originally asserted his ADA claim against all Defendants, he now concedes that the individual Defendants cannot be held liable on his ADA claim. *Accord Mason v. Stallings,* 82 F.3d 1007, 1009 (11th Cir.1996) (employers, not individual employees, can be liable under the ADA). Therefore, the only Defendants subject to this claim are ALPA and ALPA's MEC.

could no longer perform essential functions of their former position).

The *Ford* and *Castellano* courts reasoned that by imposing the "qualified individual" requirement in the context of fringe benefits, once an individual becomes disabled and eligible for disability benefits, that individual loses the ability to challenge any disability discrimination that may occur in the distribution of the benefits. These decisions found such a result to be untenable and at odds with the remedial purpose of the ADA. As the *Ford* court explained, "[i]n order for the rights guaranteed by Title I [of the ADA] to be fully effectuated, the definition of 'qualified individual with a disability' would have to permit suits under Title I by more than just individuals who are currently able to work with or without reasonable accommodations." 145 F.3d at 606.

Even if there were merit to the interpretation of the ADA taken by the Second and Third Circuits, the problem for Defendants (which they concede) is that the Eleventh Circuit has taken a contrary approach.[8] Specifically, in *Slomcenski v. Citibank, NA.*, 432 F.3d 1271, 1280 (11th Cir.2005), the Eleventh Circuit held that a plaintiff challenging the enforcement of a mental or nervous disorder disability benefits limitation had no cause of action under the ADA because she was totally disabled and unable to perform the job in question. The court found that the plain language of the ADA requires a plaintiff to demonstrate that he is a "qualified individual," i.e., that he can perform the essential functions of the job in question with or without a reasonable accommodation. *Id.* at 1280. The court concluded, "[b]ecause the ADA reserves its protection for individuals still able to perform the essential functions of a job ... a plaintiff who is totally disabled and unable to work at all is precluded from suing for discrimination thereunder." *Id.*[9]

Accordingly, because the law in this Circuit requires that a plaintiff asserting an ADA claim demonstrate that he is a "qualified individual," the Court has no choice but to grant summary judgment in favor of Defendants on Gilliland's ADA claims.[10]

### 2. *Gilliland's DFR Claim* [11]

Gilliland argues that the allegedly discriminatory manner in which Defendants

8. The Eleventh Circuit does not stand alone in this regard. The Sixth, Seventh, Eighth and Ninth Circuits have also rejected the interpretation of the ADA adopted in the Ford and Castellano decisions. *McKnight v. Gen. Motors Corp.*, 550 F.3d 519, 527 (6th Cir.2008) ("Ford court appears to have disregarded the plain language of the statute"); *Morgan v. Joint Admin. Bd.*, 268 F.3d 456, 458–59 (7th Cir.2001) (rejecting arguments predicated upon Ford and Castellano); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1112 (9th Cir.2000) ("only persons who can perform the essential functions of a job can sue under [ADA] Title I ... for compelling reasons"); *Beauford v. Father Flanagan's Boys' Home*, 831 F.2d 768, 771 (8th Cir.1987) (person unable to perform essential functions of job cannot state claim under Rehabilitation Act).

9. Interestingly, in an earlier decision, *Johnson v. K Mart Corp.*, 273 F.3d 1035, 1038 (11th Cir.2001), a divided panel of the Eleventh Circuit concluded that a former employee could bring suit under the ADA to challenge an employer's construction of. allegedly discriminatory fringe benefits even if he could not perform the job in question. However, the decision in Johnson is no longer good law as it was subsequently vacated upon the grant of a petition for rehearing *en banc*. No *en banc* decision has since issued due to a stay that was granted pending bankruptcy proceedings. *See Johnson v. K Mart Corp.*, 281 F.3d 1368 (11th Cir.2002).

10. Because the Court grants summary judgment to Defendants on Gilliland's ADA claim on this basis, the Court need not address Defendants' additional summary judgment arguments regarding this claim.

11. In asserting this claim, Gilliland's first amended complaint cites the Labor Management Relations Act of 1947, 29 U.S.C. § 185

allocated the claim amounts to a breach of the union's duty to fairly represent him.

■ The duty of fair representation is a judicially derived corollary to the union's statutory status as the employees' collective bargaining representative. *See Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 75–76, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991); *Steele v. Louisville & Nashville R.R. Co.,* 323 U.S. 192, 202–03, 65 S.Ct. 226, 89 L.Ed. 173 (1944). A union owes employees a duty to represent them adequately, honestly, and in good faith. *O'Neill,* 499 U.S. at 75, 111 S.Ct. 1127.

■ However, because unions need wide latitude to ensure effective performance of their duties, judicial review of union action must be "highly deferential." *O'Neill,* 499 U.S. at 78, 111 S.Ct. 1127; *Crawford v. AT & T,* 177 F.Supp.2d 1293, 1302 (N.D.Ga.2000). Moreover, a union violates the duty of fair representation only if its actions are "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

Putting aside the question of whether Defendants breached their duty of fair representation, Defendants first argue that Gilliland's DFR claim is time-barred.

■ In the interest of labor relations stability, courts have adopted a short six-month statute of limitations for the filing of DFR claims. *Coppage v. U.S. Postal Serv.,* 281 F.3d 1200, 1204 (11th Cir.2002); *Smallakoff v. Air Line Pilots Ass'n, Int'l,* 825 F.2d 1544, 1546 (11th Cir.1987). The

limitations period begins to run once the plaintiff discovers or should have discovered "the acts that form the basis of" the DFR claim. *Wood v. Houston Belt & Terminal Ry.,* 958 F.2d 95, 97 (5th Cir. 1992); *see also Coppage,* 281 F.3d at 1205–06 (six-month statute of limitations began to run when employee received notice of unfavorable settlement agreement between union and employer ending the grievance process). Moreover, the limitations period for a DFR claim is not tolled by the filing of an EEOC charge of discrimination against the union. *See Youngblood v. Potter,* 262 F.Supp.2d 1309, 1316–17 (M.D.Ala. 2003); *Copes v. Children's Hosp. of Philadelphia,* No. 99–1331, 1999 WL 782582, at *2 (E.D.Pa. Sept. 27, 1999).

■ Gilliland filed this action on September 7, 2007, which was nearly eleven months after he learned of the MEC's claim allocation model and decision, and nine months after he filed his EEOC charge on November 29, 2006. Defendants thus argue that Gilliland's DFR claim is untimely.

Gilliland counters that the statute of limitations did not begin to run on this claim until he began receiving claim distributions in May 2007 because it was only at that point that his damages became fixed and certain. In an attempt to advance this argument, he relies upon *Archer v. Airline Pilots Association Int'l,* 609 F.2d 934 (9th Cir.1979).

In *Archer,* the plaintiff filed suit more than six months after the union refused to

---

("LMRA"). However, the Railway Labor Act, 45 U.S.C. § 151, *et seq.* ("RLA"), not the LMRA, governs labor relations in the airline industry. *See* 29 U.S.C. § 182 (LMRA not applicable to matters subject to the RLA); 45 U.S.C. § 181 (extending scope of RLA to airline industry); *Thomas v. Ill. Cent. R.R. Co.,* 521 F.2d 208, 209 n. 1 (5th Cir.1975).

Additionally, although Gilliland originally asserted his DFR claim against all Defen-

dants, he now concedes that the individual Defendants cannot be held liable on his claim. *See Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 249, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962) ("The national labor policy requires and we hold that when a union is liable for damages . . . its officers and members are not liable for these damages"). Therefore, the only Defendants subject to this claim are ALPA and ALPA's MEC.

pursue his grievance, seeking reimbursement of legal fees that he incurred to litigate his grievance. The Ninth Circuit held that plaintiff's DFR claim was not time-barred because at the time that the union refused to process the grievance, it was impossible to estimate the amount that plaintiff would owe his attorney. *Archer*, 609 F.2d at 937–38. The court was careful to recognize, however, that in situations where it is possible to prove the extent of future injuries without resorting to undue speculation, a plaintiff's cause of action accrues when the wrongful act occurred. *Id.* at 938.

The Court is not persuaded by Gilliland's reliance upon *Archer*. First, it is distinguishable from this case. Unlike the plaintiff in *Archer*, Gilliland's damages could be calculated without undue speculation at the time that the alleged wrongful act occurred. In particular, in November 2006, ALPA provided a statement of the initial claim allocations to all pilots so that they would know the amount of their estimated initial allocation when determining whether to opt into the claim sale. Thus, by November 2006, Gilliland could have determined the extent of his damages without undue speculation. Accordingly, even under Gilliland's approach to the statute of limitations issue, his DFR claim is time-barred.

Second, *Archer* is not controlling in this circuit. Under controlling Eleventh Circuit law cited above, Gilliland's DFR claim accrued when ALPA communicated the details of the model to him and all Delta pilots on October 9, 2006. *See Coppage*, 281 F.3d at 1205–06. To the extent that Gilliland may have had a viable DFR claim based upon the claim allocation model, it began to accrue when the model was developed and disseminated to the pilots.

Gilliland filed this action on September 7, 2007, which was nearly eleven months after he learned of the MEC's claim allocation decision, nine months after he filed his EEOC charge, and well outside of the six-month limitations period. For all of these reasons, the Court finds that Gilliland's DFR claim is time-barred.[12]

### 3. *Gilliland's ERISA Claim*

Finally, Gilliland asserts that Defendants' conduct violated ERISA. As Defendants point out, a key problem with this claim is that the amended complaint fails to identify the ERISA provision under which Gilliland intends to proceed. Instead, Gilliland broadly avers that Defendants "unlawfully discriminated against [Gilliland] and breached their fiduciary obligations under ERISA by reducing the share of the ALPA claim [Gilliland was] to receive."

It appears to the Court that Gilliland intends to assert that Defendants' allegedly discriminatory conduct in developing and distributing the claim constituted a breach of their fiduciary duties, in violation of 29 U.S.C. § 1104. As Defendants correctly recognize, to prevail on this claim, Gilliland must first establish that the claim and model constituted an ERISA plan.

ERISA governs only "employee benefit plans." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (ERISA regulates employee benefit plans, not employee benefits); *see also* 29 U.S.C. § 1002(1). However, ERISA provides little guidance regarding the meaning of the phrase "employee benefit plan." *See Fort Halifax*, 482 U.S. at 8–9, 107 S.Ct. 2211. As a result, courts have developed several factors to help determine whether an ERISA

---

12. Because the Court grants summary judgment to Defendants on Gilliland's DFR claim on this basis, the Court need not address Defendants' additional summary judgment arguments regarding this claim.

plan exists, including (1) the amount of discretion involved in disbursing the benefits; (2) whether the benefits are disbursed on an ongoing or one-time basis; (3) whether the obligation to pay benefits is triggered by a single event; and (4) whether the employer assumed a long-term obligation to review claims and make payments. *Nadworny v. Shaw's Supermarkets, Inc.*, 405 F.Supp.2d 124, 130–31 (D.Mass.2005); *see also Donovan v. Dillingham*, 688 F.2d 1367, 1372 (11th Cir. 1982) ("At a minimum ... a 'plan, fund, or program' under ERISA implies the existence of intended benefits, intended beneficiaries, a source of financing, and a procedure to apply for and collect benefits."). Applying these factors, an employer benefit is more likely to constitute an ERISA plan if it gives the administrator significant discretion in the distribution of benefits, if it is disbursed on an ongoing basis, if it is not triggered by a single event, and if the employer assumes a long-term obligation to review claims and make payments. *Nadworny*, 405 F.Supp.2d at 131.

Additionally, in *Fort Halifax*, the Supreme Court provided further guidance on the meaning of the phrase "employee benefit plan." The Court held that a Maine statute requiring lump-sum severance payments to employees displaced by plant closures was not an employee benefit plan. *Fort Halifax*, 482 U.S. at 8–9, 107 S.Ct. 2211. The Court explained that ERISA was not triggered because the Maine statute created no "need for an ongoing administrative program for processing claims and paying benefits." *Id.*

In reaching this conclusion, the Supreme Court explained that ERISA was enacted by Congress in part to protect employers from a "patchwork scheme" of regulations with respect to employee benefits. *Id.* at n. The Court reasoned that this concern is not present when the employer's only obligation is to draw a check as opposed to

when the benefits in question place "periodic demands" on employer assets, thereby creating the need for financial administration and control. *Id.* at 12, 107 S.Ct. 2211.

The Court also recognized that ERISA was enacted to safeguard the financial integrity of employee benefit funds, to permit employee monitoring of earmarked assets, and to ensure that employers' promises are kept. *Id.* at 14, 107 S.Ct. 2211. Because a one- or two-time payment requires no greater assurance than that the check will not bounce, ERISA's safeguards are not needed in that situation. *Id.* Conversely, an employer benefit that requires ongoing investment and administrative obligations is vulnerable to employer abuse and requires the protections of ERISA. *Id.* at 14–16, 107 S.Ct. 2211.

Defendants argue that, as with the severance payments in *Fort Halifax*, ERISA is not applicable here because the model and the claim allocation did not establish, nor do they require, an ongoing administrative program. Defendants point out that unlike a standard ERISA plan, there is no designated plan administrator and the model does not impose any long-term obligations on Defendants to review claims or make payments.

Virtually barren of citation to relevant case law, Gilliland's main argument on this issue appears to be that ERISA should apply because Delta distributed a portion of the claim proceeds into ERISA retirement plans.

▄▄ After careful review, the Court agrees with Defendants that the model and the claim allocation do not constitute an ERISA plan. As in *Fort Halifax*, the Court finds that the absence of any ongoing administrative program with respect to the benefits in question is fatal to Gilliland's ERISA claim. The claim proceeds were subject to limited administration for

a limited period of time. The proceeds were distributed in a limited number of payments over the course of two years and in accordance with fixed calculations established in the model. Although the process that Defendants went through to construct the model and determine how the allocation would take place was complex, it did not create the type of ongoing administrative scheme contemplated by ERISA. *Accord Delaye v. Agripac, Inc.*, 39 F.3d 235, 237 (9th Cir.1994) (employer's commitment to pay a fixed monthly sum according to a contractual formula for up to twenty-four months after separation from employment was not an ERISA plan). At bottom, the model and the claim allocation do not pose the types of employer administrative abuses that ERISA was enacted to stamp out, which primarily include "self-dealing, imprudent investing, and misappropriation of plan funds." *Fort Halifax*, 482 U.S. at 15, 107 S.Ct. 2211.

Moreover, unlike the typical ERISA plan, the main purpose of the claim was not to provide welfare benefits or pension benefits. Instead, its purpose was to provide a single instance of compensation to Delta pilots as consideration for the modifications in wages, work rules, and other terms and conditions of employment that resulted from the execution of LOA 51.

Additionally, the fact that the claim distributions were in part paid into an ERISA-covered plan does not alter the underlying purpose of either the claim or the model, nor does it transform them into an ERISA plan. Otherwise, the treasury of any employer that makes contributions into ERISA retirement plans for its employees could be considered an ERISA plan, which is inconsistent with controlling law. *See Local Union 2134, United Mine Workers of Am. v. Powhatan Fuel, Inc.*, 828 F.2d 710, 714 (11th Cir.1987) ("until monies were paid by the corporation to the plan there were no assets in the plan under the provisions of ERISA").

Finally, the Court notes that its conclusion is supported by Judge Paul L. Friedman's denial of the plaintiffs' motion for preliminary injunction in the closely analogous case of *Garavito v. Air Line Pilots Association, Int'l,* Case No. CA–07–384 (PLF) (D.D.C. Mar. 5, 2007).[13] Like the

---

**13.** Defendants cited *Garavito* in their reply brief and attached a copy of the preliminary injunction hearing transcript from that case as an exhibit to their brief. Defendants also attached other supplemental materials to their reply brief, including deposition excerpts and exhibits that were responsive to arguments that Gilliland made in his opposition brief.

Gilliland moves to strike these additional materials, principally contending that the *Garavito* case had never been seen before by Plaintiff's counsel. The Court declines to strike the additional materials that Defendants submitted. The supplemental materials attached to Defendants' reply brief were responsive to arguments and documents offered by Gilliland in his opposition brief. Moreover, Gilliland cites no authority that would require Defendants to previously disclose their intent to rely upon *Garavito* in support of their motion for summary judgment. Finally, Defendants did not assert any new arguments in their reply brief; they simply buttressed previously–made arguments with new legal authority.

Alternatively, Gilliland moves to file a sur-reply in opposition to Defendants' motion for summary judgment. However, neither the Federal Rules of Civil Procedure nor this Court's Local Rules authorize the filing of sur-replies. *See Byrom v. Delta Family Care–Disability & Survivorship Plan*, 343 F.Supp.2d 1163, 1188 (N.D.Ga.2004). Although the Court may in its discretion permit the filing of a sur-reply, this discretion should be exercised in favor of allowing a sur-reply only where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief. *See Hammett v. Am., Bankers Ins. Co.*, 203 F.R.D. 690, 695 n. 1 (S.D.Fla.2001). As already noted, Defendants did not make any new arguments in their reply brief. Moreover, other than his dislike for the holding of *Garavito*, Gilliland does not specify what statements Defendants

case at bar, *Garavito* involved a challenge to a union's allocation and distribution of a financial return provided under a concessionary agreement. United Airlines, while in bankruptcy proceedings, reached a concessionary agreement with ALPA that provided it with convertible notes with a face value of $550 million. Like the case at bar, ALPA adopted a formula to allocate and distribute among pilots the note proceeds that would be partially distributed into retirement plans. The plaintiffs argued that ALPA distributed these proceeds in a manner that disfavored the senior pilots in violation of ERISA, and they filed a motion for a preliminary injunction to enjoin the distribution.

During the March 5, 2007 preliminary injunction hearing before Judge Friedman, the court faced head-on the threshold question of whether the notes, allocation, and distribution constituted an ERISA plan. The court found that ERISA did not apply, noting that as in *Fort Halifax,* no administrative scheme within the meaning of ERISA had been created. In denying the plaintiffs' motion for a preliminary injunction, the court explained:

> [T]he employer and the union ... came to an agreement on a means of compensating ... pilots for the loss of anticipated future retirement income in a one-time lump sum payment ... from the employer to the Bank of New York trustee, to be followed by two distributions from that trust.
>
> United's obligation to pay the pilots is complete after making only two payments, after which United has no further obligation. And that's very much like the situation in *Fort Halifax.* [The

allocation and distribution method that ALPA developed] did not create the kind of administrative scheme that was ongoing [from which] one can infer the creation of a plan under ERISA's definition.

Thus, *Garavito* provides further support for Defendants' argument that the model and claim allocation do not fall within the ambit of ERISA.[14] Accordingly, to the extent that Gilliland asserts an ERISA breach of fiduciary duty claim, that claim fails as a matter of law.

In addition, upon a review of the briefs in this matter, it now appears that Gilliland purports to assert an ERISA retaliation claim pursuant to 29 U.S.C. § 1140. He argues that Defendants' design and implementation of the model was motivated by a desire to retaliate against him for exercising his right to receive benefits under the LTD plan (a plan both parties agree is covered by ERISA). However, because Gilliland did not assert an ERISA retaliation claim in his pleading, it is not properly before the Court. *Accord Brown v. Snow,* 440 F.3d 1259, 1266 (11th Cir. 2006) (district court properly refused to address claim of retaliation that was not included in complaint).

■ Moreover, even if this claim were properly before the Court, it fails as a matter of law. Section 510 of ERISA prohibits discrimination against any plan member "for exercising any right to which he is entitled under the provisions of the employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may

made in their reply brief that would compel him to file another brief. It also bears noting that the Court has given both sides in this case significant extensions regarding the page limitations normally applicable to motions for summary judgment. For all of these reasons, the Court finds that further briefing is unwar-

ranted and will therefore deny Gilliland's motion to file a sur-reply.

**14.** After Judge Friedman issued his Order in *Garavito* denying the plaintiffs' motion for a preliminary injunction, the plaintiffs voluntarily dismissed their claims.

become entitled under the plan...." 29 U.S.C. § 1140. To prevail under § 510 of ERISA, a plaintiff must show that the "alleged discrimination was designed either to retaliate for the exercise of a right or to interfere with the attainment of an entitled right." *Owens v. Storehouse, Inc.*, 984 F.2d 394, 398 (11th Cir.1993). Notably, it is "insufficient merely to allege discrimination in the apportionment of benefits under the terms of the plan." *Id.*

 Gilliland does not explain nor does he cite any evidence regarding how Defendants interfered with his right to receive LTD benefits. *See Clark*, 990 F.2d at 1222–23 ("The ultimate inquiry in [an ERISA retaliation] case is whether the employer had the specific intent to interfere with the employee's ERISA rights"). Although Gilliland's status as an LTD pilot in part determined the amount of his claim allocation, the allocation did not affect in any way his continued receipt of LTD benefits or his employment status. *See Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 237 (4th Cir.1991) (primary purpose of § 510 is to prevent unscrupulous employers from discharging or harassing employees to prevent them from obtaining vested pension rights); *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1491–92 (11th Cir.1993) (intent to reduce costs does not establish ERISA § 510 claim).

Stated another way, even though Gilliland has adduced evidence that Defendants may have taken his LTD status into account in apportioning the claim, he has failed to proffer any evidence that Defendants had a specific intent to violate or interfere with his rights under ERISA. *See Owens*, 984 F.2d at 399 ("To survive summary judgment, therefore, a plaintiff must present evidence of the employer's specific intent to violate ERISA."). Delta pilots (including Gilliland) either do or do not qualify for LTD benefits based upon their ability to maintain a First Class Airman Medical Certificate. Nothing about the model or the claim distribution interferes with Gilliland's ability to maintain his LTD status. For all of these reasons, the Court grants summary judgment in favor of Defendants on Gilliland's ERISA retaliation claim.[15]

### III. *Conclusion*

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment [82], GRANTS Defendants' motion for leave to file excess pages [111], DENIES Plaintiffs motion to strike [117], and DENIES as MOOT Plaintiffs motion for class certification [74].[16] The CLERK is DIRECTED to close this case.

---

15. Because the Court grants summary judgment to Defendants on Gilliland's ERISA claim for these reasons, there is no need to address Defendants' alternative arguments regarding why Gilliland's ERISA claim fails.

16. Because summary judgment was granted on underlying claims of the class representatives, the issue of class certification is moot. *See Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1234 n. 4 (11th Cir.2009).